411 F.Supp. 871 (1976)
SANTA CRUZ BUILDING ASSOCIATION, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 75-397C(4).
United States District Court, E. D. Missouri, E. D.
March 25, 1976.
*872 *873 John J. Donnelly, St. Louis, Mo., for plaintiff.
Michael D. Howard, Trial Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

OPINION
NANGLE, District Judge.
In this action, plaintiff brought suit pursuant to Title 28 U.S.C. § 1346(a)(1) to recover internal revenue taxes, interest and penalties alleged to have been erroneously collected.
This case was tried before the Court without a jury. The Court having considered the pleadings, the documents in evidence, the stipulations of the parties and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
1. Plaintiff, Santa Cruz Building Association, is a corporation organized under a Pro-Forma Decree of the Circuit Court of St. Louis County, Missouri, with its principal office in St. Louis County.
2. On or about April 23, 1907, the Santa Cruz Council, Knights of Columbus 1215, was chartered in St. Louis (hereinafter referred to as "The Council"). The Council is a subordinate council of the Knights of Columbus incorporated in Connecticut. The Knights of Columbus was incorporated in 1882 to organize and operate a fraternal beneficiary society under the lodge system for the benefit of its members.
3. The Knights of Columbus received a Ruling letter from the Internal Revenue Service on October 25, 1940. The Ruling exempted the Knights of Columbus under Section 101(3) of the Internal Revenue Code of 1939 (now Section 501(c)(8) of the 1954 Code). This section grants tax exempt status *874 to fraternal beneficiary societies which maintain insurance benefits for members. The Ruling was a "Group Ruling letter" and therefore applied to subordinate councils, such as the St. Louis Santa Cruz Council, as long as they also comply with the appropriate Internal Revenue Code sections.
4. On May 13, 1946 members of the Santa Cruz Council filed Articles of Association for a Pro-Forma Decree of Incorporation for an entity named "The Santa Cruz Building Association" (hereinafter referred to as the "Building Association" or "Association") with the St. Louis County Circuit Court. These articles were approved by the Circuit Court in May, 1946.
5. The articles were amended in 1953, 1967 and 1968. Among the sections amended was the section stating the object of the organization. From 1953 to 1967 (and again commencing in 1968) this section read:
The objects of this organization shall be of a social nature, its purposes being to promote better relations amongst its members to provide grounds, buildings and equipment for educational, recreational and physical activities for their members, families and friends at no cost.
In 1967 the amended article read:
The purpose for which the corporation is organized shall be to promote better relations amongst its members; to provide grounds, buildings and equipment for educational and physical activities for the members; to produce, secure and provide funds and facilities to SANTA CRUZ COUNCIL OF KNIGHTS OF COLUMBUS to assist, provide and promote the welfare of charitable organizations.
6. The Articles of Association of the Building Association provide that the Association assets be turned over to the Council upon dissolution of the Association.
7. The Building Association is a separate corporate entity. The Council is subject to the rules of the National Knights of Columbus while the Building Association is not; both have their own officers, keep separate financial and minute books and have separate bank accounts. The membership of both organizations is identical. Those persons who join the Council automatically become members of the Building Association.
8. The Building Association charged both members and non-members rent for the use of its hall. On the average during the years 1964 to 1971 the Council used the hall 30% of the time while the public used the hall the remaining 70% of the time.
9. The Building Association advertised in both the yellow pages of Southwestern Bell Telephone Directory and in the Knights of Columbus golf magazine. Advertising expenditures between 1965 and 1971 ranged from a low of $282.00 in 1967 to a high of $445.00 in 1969.
10. The Building Association entered a lease agreement with General Motors Corporation in November of 1966. The parties have stipulated that for 3 years thereafter General Motors Corporation paid $39,424.80 per year to the Association for use of its parking facilities.
11. Yearly receipts, from 1965 to 1971, from bar sales and from building and parking lot rentals amounted to:

 1965 $33,888.15
 1966 39,644.53
 1967 59,362.59
 1968 78,119.39
 1969 85,668.66
 1970 67,448.74
 1971 45,064.20
 (fiscal year ending June 30th
 of each year listed.)

12. These receipts accounted for the principal source of income for the Building Association. Rental of the hall occurred on a regular and recurring basis through 1971.
13. The Building Association operating committees were: buildings, grounds, publicity, rental, and bar.
14. The annual audits show a cash balance retained by the Association of:

 1965 $37,129.73
 1966 42,494.02
 1967 51,725.14
 1968 79,408.24
 1969 119,925.02
 1970 112,334.44
 1971 119,633.58
 (fiscal year ending June 30th
 of each year listed.)

*875 15. In the years of 1965 to 1971 the Association engaged in the following social welfare endeavors. It listed as donations $95.00 in 1965, $200.00 in 1966, and $250.00 in 1967. Between 1968 and 1971 the Association

 Spent Reason
$ 2,500.00 Statue of Christopher Columbus
 7,200.00 Bus for the Boy Scouts
 40,000.00 St. Mary's Home for exceptional children
 500.00 Catholic Youth Council
 500.00 Directors, Inc. (alcoholic center)
 500.00 Missions in Peru
 1,500.00 Little Sisters of the Poor
 1,500.00 Oblates of Mary Immaculate
 500.00 Pine Lawn Boys Club

The Association also sponsored an Easter egg hunt for children of members of the Council and underwrote a golf tournament benefit for St. Mary's.
16. During this time the Building Association also improved its parking lot at a net cost to it of $6,602.69 and installed a new ceiling and air conditioning at the cost of $10,329.80. It spent over $10,000.00 per year for beer, cigarettes and soda. In 1968 it began to set aside $2,000.00 per month for the future acquisition of real estate, but without a determination as to the ultimate disposition of the fund. In 1970, the Association purchased a $10,250.00 corporate bond.
17. Until December 31, 1971, several of the Association's principal activities consisted of renting its hall for weddings, meetings, dances and selling liquor and beer to members and to the general public who rented its facilities.
18. On April 29, 1970 the Building Association filed an exemption application, Form 1023, claiming an exemption as a charitable organization under section 501(c)(3). The Building Association, in its application, described itself as an organization for the Santa Cruz Council of the Knights of Columbus. By letter dated August 7, 1970 the Internal Revenue Service denied the plaintiff any exemption under sections 501(c)(2), (3) and (7).
19. On November 2, 1971 the Building Association filed Form 1120, U. S. Corporate Income Tax Returns, paying a total of $35,032.11 in taxes for the years 1965, 1967 through 1971.
20. On November 2, 1971 the Building Association also filed Form 843, Claim for Refund, for each year in question. The Association claimed that the reason it was entitled to a refund was that "Taxpayer qualifies as a tax-exempt organization".
21. On December 3, 1971 the Association was notified by the Treasury Department, Internal Revenue Service Center, Kansas City, Missouri, that adjustments to the tax liability had been made by adding penalties and interest for each year in question. The total amount of penalties and interest assessed was $13,968.25.
22. On February 2, 1972 the Association paid a total of $13,968.25 in penalties and interest.
23. On February 19, 1972 the Association again filed Form 843 for each year in question, claiming a refund for the penalties and interest paid for each of the 6 years at issue. The Association gave as the reason for refund "Taxpayer qualifies as a tax-exempt organization".
24. On March 16, 1972 the Internal Revenue Service wrote to plaintiff concerning plaintiff's claim for refund of penalties and interest. Defendant requested information about the reasons for filing claims for refund. There is no record of a response by plaintiff to this query.
25. On October 16, 1974 the Building Association received notice of disallowance of its claim for refund.
26. On or about October 22, 1974 an additional assessment of taxes, interest and additions to tax were made by the Internal Revenue Service for the taxable year ending June 30, 1968. The net balance due, after credit was applied to the assessment, amounted to $2,658.73. The association paid this net balance on or about December 3, 1974. Plaintiff has filed no claim for refund of this amount.
27. On September 26, 1975, three days before the date set for trial, defendant filed a motion to dismiss plaintiff's complaint for *876 failure to comply with Treasury regulations concerning refund requests. This motion was taken under submission by the Court with the case.

CONCLUSIONS OF LAW
Prior to a hearing on the merits, defendant filed a motion to dismiss for lack of subject matter jurisdiction. Defendant claims that as a matter of law plaintiff's "Claims for Refund" failed to comply with both the Code and Regulation requirements that the refund claim be detailed.
Section 7422(a) of the Internal Revenue Code, Title 26 U.S.C. § 7422(a), provides:
No suit . . . shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously . . . collected . . . until a claim for refund or credit has been duly filed with the Secretary . . . according to the . . . regulations . . .
Treasury Regulations § 301.6402-2(b)(1) establishes the detail required in the claim filed with the Internal Revenue Service:
The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. . . . A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.
Plaintiff, in its Claims for Refund for taxes paid and claims for penalty and interest paid stated as the reason for the refund request "Taxpayer qualifies as a tax-exempt organization". Thus, the issue presented is whether this statement sufficiently advises the Internal Revenue Service of the basis for claims as required by the Regulations.
The reason for this rule is two-fold. First, courts should not make tax determinations before the agency most qualified to handle these matters tackles the issue. Second, the taxpayer claiming a refund can more quickly explain his reasons, which often depend on individual factual situations, than can the Commissioner. The rule represents an attempt to economize administrative time. "Treasury Regulations are calculated to avoid dilatory, careless, and wasteful fiscal administration by barring incomplete or confusing claims." Angelus Milling Co. v. Commissioner of Internal Revenue, 325 U.S. 293, 297, 65 S.Ct. 1162, 1164, 89 L.Ed. 1619, 1623 (1945).
The claim itself is not the only information upon which the Commissioner relies to determine the basis of the claim. Thompson v. United States, 209 F.Supp. 530, 539 (E.D.Tex.1962), rev'd on other grounds 332 F.2d 657 (5 Cir. 1964). In the present case, the government also had available to it an August, 1970 claim for a tax exemption and a history of the Building Association's activities and purposes filed with that claim. These, together with the claim of "tax-exempt" seem sufficient to advise the Commissioner that 26 U.S.C. § 501 (exemption from tax on corporations, certain trusts, etc.) was at issue. The remaining question is whether plaintiff must further specify which subsections of § 501 are applicable; whether "each ground" is satisfied by pointing out the applicable section of the Code.
Defendant cites two cases to support its position that reference to § 501 is insufficient. Contractors Supply Corp. v. United States, 386 F.Supp. 907 (D.C.Va.1974) and Gainesville Nehi Bottling Co., Inc. v. United States, 74-2 U.S.T.C. ¶ 9745 (D.C.Ga.1974). In neither case were the grounds stated sufficient. In Contractors the ground was "[A]ssessment was made contrary to the laws of the United States," and in Gainesville the ground was "audit is erroneous". These cases, however, are not determinative. Both reasons are much broader than plaintiff's statement. In Contractors, the Commissioner had no idea of which law to apply whereas in this case he is apprised of the appropriate section of the Internal Revenue Code. In Gainesville, the Commissioner had no idea of why the audit was erroneous, or which part was at issue. Here, the Commissioner knows both the amount at issue and the reason why it is at issue.
*877 More to point in the case of Walker v. United States, 143 F.Supp. 566 (N.D.Tex. 1956), aff'd, 5 Cir., 240 F.2d 601, cert. denied, 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538 (1957). In that case plaintiffs stated as the reason for a claim of refund that collection of a penalty (for not disclosing in an anticipatory return the amount of estimated tax that would be owed) was unconstitutional. No part of the Constitution was pinpointed. The Court held that this was sufficient notice to the Commissioner. Claiming a tax refund under § 501 is no more broad than claiming a tax refund under the Constitution. Thus plaintiff's claim meets the requirements of the Treasury Regulation and so satisfies the jurisdictional requirements of 26 U.S.C. § 7422(a).
Plaintiff alternatively argues that the government by its late action in filing the motion to dismiss, has waived its claim of lack of jurisdiction. Waiver may occur either by a very tardy motion on the part of the government or by action on the merits by the Internal Revenue Service. Filing a motion just prior to trial, while questionable, is not sufficient for a waiver. Cf. Helis v. Usry, 496 F.2d 1319 (5th Cir. 1974); Reynolds v. McMurray, 77 F.2d 740 (10th Cir. 1935) (government filed motion after trial completed).
Nor has the government waived its rights to demand detailed grounds for a refund claim by action on the merits. The letter of October 16, 1974 which advised plaintiff that his claim for refund had been disallowed stated as the reason "Per Audit Determination". An audit is not an action on the merits. Hanna Iron Ore Co. v. United States, 68 F.Supp. 832, 837 (E.D.Mich. 1946):
Evidence showing an examination of claimant's books by the Commissioner, without evidence that his attention was focused on the merits of the particular dispute, failed to sustain claimant's burden of showing that Commissioner had waived defects in claim.
While the government has not waived its right to demand further explanation for a refund, the government should be estopped from claiming that right in this case for two reasons. First, the form letter sent to plaintiff on October 16, 1974 advised it that "your claim is fully disallowed" and that if plaintiff still desired to claim a refund "you may do so by filing such a suit with the United States District Court having jurisdiction". The defendant, by its last communication with plaintiff, invited it to court. Second, while the government gave as the reason for disallowance "Per Audit Determination" they did not state that the reason was failure to comply with Regulations, thus making the Association's claim impossible to process. This they could easily have done as evidenced by their earlier letter of March 16, 1972 requesting additional details from the Association in order to process their claims for interest and penalty. (No such request by the government was made to obtain more details about the claim of refund for taxes paid, although those forms were identical to the claims for interest and penalties.) The October 16, 1974 letter to plaintiff was unnecessarily unclear and misleading, thus the government should be estopped from denying jurisdiction based on plaintiff's failure to follow Regulations. Therefore, the Court concludes that jurisdiction, pursuant to Title 28 U.S.C. § 1346(a)(1) and Title 26 U.S.C. § 7422, exists.
Plaintiff Building Association requests a finding of exemption under any of four subsections of section 501(c) of the Internal Revenue Code (IRC). Any organization that is listed under § 501(c) is exempt from tax under § 501(a). Specifically, plaintiff contends that it is exempt as a title holding corporation under § 501(c)(2), or as a corporation organized and operated exclusively for religious or charitable purposes under § 501(c)(3), or as a civic organization under § 501(c)(4), or as a club organized and operated exclusively for pleasure, recreation and other non-profitable purposes under § 501(c)(7). Each will be analyzed separately.
*878 Section 501(c)(2) in conjunction with § 501(a) exempts:
Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom and turning over the entire amount thereof, less expenses, to an organization which itself is exempt under this section.
Defendant argues that this section is not applicable to the Building Association for three reasons: the Association has accumulated income over the years rather than turning it over to an exempt organization, the Association was not organized exclusively to hold title to property, and the Association engages in business activities other than holding title and collecting income. Plaintiff merely argues that as its funds will pass to the Knights of Columbus upon dissolution of the Association, the fact that no money has yet been turned over to the Knights of Columbus is irrelevant.
To be exempt a corporation must be "organized" exclusively to hold title to property. "Organized" under § 501(c)(2) refers not to the actual operation of a club but to the purpose stated in its articles of incorporation. Gagne v. Hanover Water Works Co., 92 F.2d 659 (1st Cir. 1937); Sun-Herald Corp. v. Duggan, 73 F.2d 298 (2nd Cir. 1934); Banner Building Co. v. Commissioner, 46 BTA 857 (1942).
In Article II of the Articles of Association, the Building Association states its purposes. While these have been amended in 1953, 1967 and 1968, they state essentially the same purpose: "being to promote better relations amongst its members, to provide grounds, buildings and equipment for educational, recreational and physical activities for the members". Obviously, this purpose is not exclusively that of holding title. While "exclusively" does not mean "only", but rather "primarily", even under this test plaintiff's claim must fail. Cf. Treas.Reg. § 1.501(c)(3)-1(c)(1). The articles allow the Association not only to hold and maintain property, but also to promote relations among members, without limitation as to the means used for this purpose. Rev.Rul. 58-566, 1958-z Cum.Bull. 261. (The corporation in this Ruling could deal in securities and acquire real and personal property. These powers were determined to be broader than those necessary to a holding company, thus exemption was denied.)
Furthermore, from the actual operation of the organization, it is clear that the Association was engaged in activities of a broader scale than merely holding title. Roche's Beach, Inc. v. Commissioner of Internal Revenue, 96 F.2d 776 (2nd Cir. 1938). In Roche's Beach, the organization not only held title to property but also operated a beach business (renting boathouses, towels, suits, concession stands). From an examination of the corporate activities, the court concluded that the purposes of creating the organization were broader than merely holding title. Thus no exception could be taken under § 501(c)(2). In this case, by plaintiff's own admission, the Association participated in numerous activities totally unconnected with title holding. To the extent that these operations reflect organizational purposes, they are evidence of purposes broader than allowed by § 501(c)(2).
It is also clear from the Annual Audit statements submitted that for each year at issue the Association carried over substantial and increasing amounts of income. In 1965, $32,238.56 in cash was carried over. By 1971, the amount had increased to $112,334.44. In none of these years did the Association operate at a loss, thus it cannot be contended that income was retained to cover expenses. Income may be retained only to meet normal operational expenses. See Rev.Rul. 67-104, 1967-1 Cum.Bull. 120. Even in this Ruling, while income could be retained each year, it could not be accumulated over the years. Under these circumstances, Treas.Reg. § 1.501(c)(2)-1(6) applies: "A corporation described in section 501(c)(2) cannot accumulate income and retain its exemption . . .".
In summary, the Building Association does not qualify for exemption as a *879 § 501(c)(2) corporation because it was not organized to operate exclusively as a title holding company and because it accumulated income from year to year.
Section 501(c)(4) in conjunction with § 501(a) exempts:
Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare . . [remainder applies to employee associations.]
The government argues that the Building Association is not exempt under this provision because the Association was operated primarily for the benefit of its members, not the community as a whole, and because it carried on a business for profit with the general public. Under the Regulations neither of these elements may be present if an exemption is sought. Treas.Reg. § 501(c)(4)-1(a)(1)(i) and (ii). See also People's Educational Camp Society, Inc. v. Commissioner of Internal Revenue, 331 F.2d 923, 929 (2nd Cir. 1964), cert. denied 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964). The Association, on the other hand, argues under authority of a Revenue Ruling that sources of income are irrelevant when the organization's primary activity is civic or for the promotion of social welfare. Rev.Rul. 66-221, 1966-2 Cum.Bull. 220. In the stipulated facts, the association admitted that their primary source of income was derived from rentals (of building space and parking lot) and bar receipts.
In Rev.Rul. 66-221 (superseded in 1974 by Rev.Rul. 74-361 restating the same position) a voluntary fire-fighting association was found to be exempt even though its primary source of income came from sponsoring public dances. These social dances were found to be both incidental to the primary objective of operating a fire-fighting association and in furtherance of this objective as they brought volunteers together "in a working unit".
In substance, the Association argues for an "ultimate destination" test to determine exemption. Under this theory, it is not the nature of activities carried on but what is eventually done with the earnings that is determinative. Fund-raising activities are distinguished from social welfare activities, or those activities using the proceeds of fund-raising activities. One set of activities thus becomes the source or means to supply another set of activities or the "ends".
The primary difficulty with the ultimate destination test lies in the arbitrary, unstated assumption that fund-raising activities are but sources of funds, and thus should be ignored, while recognized charitable endeavors are the end activities and thus are to be considered to determine exemption. There exists a danger, however, that fund-raising activities may take on more importance than the purpose for which they were originally enacted. The ultimate destination test is oblivious to this possibility.
A case illustrating this is People's Educational Camp Society, Inc. v. Commissioner of Internal Revenue, supra. The Rand School of Social Science organized a membership corporation which ran a summer camp in the Poconos. Eventually the Rand School disbanded, but the Pocono retreat continued. In all respects, the camp competed with other summer resorts in the area. The organization also sponsored various programs of public interest such as musical composition contests, book award luncheons, seminars, and public forums. The amount spent on Social Welfare activities per year varied from less than 10% of accumulated earned surplus to almost 33%. The court rejected the notion that the summer retreat was but an "income producing operation designed to finance its social welfare activities".
The destination test ought not to be used to permit an entity to escape taxation where, as here, so much of its revenues are devoted to expanding its commercial facilities and increasing its surpluses, and so little of its revenues are actually spent for social welfare activities, that it is factually clear that the primary purpose of the organization is not really the promotion of social welfare but the running of a commercial operation.
Id. at 933.
*880 As the following table demonstrates, in no year did the Association donate even 33% of its surplus cash to any social welfare endeavor.

 Year ending
 6-30 Cash Balance Contributions[1]
 1965 $ 37,129.73 $ 95.00
 1967 51,725.14 3,175.25
 1968 79,408.24 22,500.00
 1969 119,925.02 28,700.00
 1970 112,334.44 24,715.00
 1971 119,633.58 2,125.00

During these same years, plaintiff also improved its parking facilities, the ceiling to the meeting hall and installed air conditioning. It also spent over $10,000.00 every year to buy cigarettes, beer and soda. These activities cannot be ignored in determining the purpose of an organization. They are evidence of an on-going business and negate the argument that the Building Association operates exclusively to promote social welfare.
Another case on point is Club Gaona, Inc. v. United States, 167 F.Supp. 741 (S.D.Cal. 1958). In Club Gaona the main source of income and principal activity of the organization were holding weekly public dances. The Club recognized profits from these dances which were used both to promote charitable endeavors and to speculate in real property. Exemption was denied as "plaintiffs derived their income from the promotion of public dances at a profit and that the profits were devoted to the accumulation of funds which were not used for any ascertainable civic projects," (emphasis original). In the present case also, profits were both accumulated and used for non-charitable endeavors. A corporate bond was purchased, and in 1968 $2,000.00 per month was earmarked "for the future acquisition of real estate".
Activities which inure to the benefit of members of the organization, without cost to them, can not be said to promote social welfare as that term is understood in the I.R.C. See, e. g. United States v. Pickwick Electric Membership Corp., 158 F.2d 272, 276 (6th Cir. 1946) which states that "civic" "embodies the ideas of the citizens of a community cooperating to promote the common good and general welfare of the community." (emphasis added); People's Educational Camp Society, Inc. v. Commissioner of Internal Revenue, supra at 930 ("civic" defined co-extensively with "social welfare" in the Pickwick case). See also Rev.Rul. 61-158, 1961-2 Cum.Bull. 115 (no exemption for an organization whose principal source of income was a weekly public drawing when profits used primarily for general organization expenses even though by-laws provide that all profits above reasonable operating expenses were to be devoted to social welfare purposes.)
Thus, the claim based on § 501(c)(4) must fail. Organizations primarily engaged in profit making and nonsocial welfare activities can not take an exemption under this section. Treas.Reg. § 1.501(c)(4)-1(a)(1)(i) and (ii); People's Educational Camp Society, supra; Rev.Rul. 61-158, supra; Rev.Rul. 68-46, 1968-1 Cum.Bull. 260 (war veterans organization not exempt when it was primarily engaged in renting a commercial building and operating a public banquet and meeting hall having bar and dining facilities).
Section 501(c)(7) in conjunction with § 501(2) provides an exemption for:
Clubs organized and operated exclusively for pleasure, recreation and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder.
At issue under this section is whether the Building Association "operated exclusively . . . for nonprofitable purposes." The government argues that it did not, citing the Treas.Reg. § 1.501(c)(7)-1(6). This regulation is directly on point:
A club which engages in business, such as making its social and recreational facilities *881 available to the general public . . is not organized and operated exclusively for pleasure, recreation, or other nonprofitable purposes, and is not exempt under section 501(a).
The Building Association, citing the second sentence of the above regulation, that solicitation by advertising is prima facie evidence of engaging in business, argues that the government has made out a prima facie case and has proved nothing conclusively. The Building Association does not refute the government's contention that it did not operate exclusively for nonprofit purposes. On the contrary, it has admitted both that its primary source of income is from the public and that its hall is used 70% of the time by the general public.
The taxpayer has the burden of proof of establishing its qualification for exemption. Harding Hospital, Inc. v. United States, 505 F.2d 1068 (6th Cir. 1974); Augusta Golf Ass'n v. United States, 338 F.Supp. 272 (D.C.Ga.1971). A prima facie case by the government, without refutation by the Association is sufficient to sustain a denial of exemption. Cf. Trotter v. Tennessee, 290 U.S. 354, 356, 54 S.Ct. 138, 139, 78 L.Ed. 358, 360 (1933) ("Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced.")
The facts are convincing that plaintiff was engaged in a business. The Association's dealings with the general public involved neither "one-shot affairs", nor insubstantial amounts of money, nor activities distinguishable from those of profit-making organizations. Plaintiff stipulated that the building facilities were rented on a recurring basis and that its primary source of income came from rentals and bar receipts. When rented, the hall was used for activities such as meetings and weddings, which were events totally unconnected with the Building Association's membership purpose.
Furthermore, to be exempt as a social club, there must exist a meaningful "commingling of members" which plays a material part in the life of the organization. Rev.Rul. 58-589, 1958-2 Cum.Bull. 266. While the Building Association was organized with such a purpose, it was not operated to carry out that purpose. In the stipulated facts, it stated that its purpose was to act "as a housekeeping organization for the Santa Cruz Council of the Knights of Columbus". There is no evidence that the Building Association, as a separate entity, engaged in any social or recreational activities. That it may have done so through the Knights of Columbus is irrelevant. Polish Army Veterans v. Commissioner of Internal Revenue, 236 F.2d 509 (3rd Cir. 1956) (An association formed with members of the veterans Post whose primary function was to provide a building or clubrooms to the Post was not functioning as a social club).
Given these recurring and substantial business activities, it is clear that the Building Association is not exempt. See United States v. Fort Worth Club of Fort Worth, Tex., 345 F.2d 52 (5th Cir. 1965), modified on other grounds 348 F.2d 891 (5th Cir. 1965) (For social club exemption, profits from outside activities must be incidental to club activities and either negligible or non-recurring); Polish Army Veterans v. Commissioner of Internal Revenue, supra (veterans association whose principal source of income came from bars operated in clubrooms rented to the public was not exempt); Aviation Club of Utah v. Commissioner of Internal Revenue, 162 F.2d 984 (10th Cir. 1947), cert. denied 332 U.S. 837, 68 S.Ct. 220, 92 L.Ed. 409 (1947) (Aviation Club lost its exemption by allowing military officers as "guest members" during World War II; income derived therefrom was "substantial and continuing"); West Side Tennis Club v. Commissioner of Internal Revenue, 111 F.2d 6 (2nd Cir. 1940) (Tennis Club which held national championship matches open to the public from which it received more than one-half its gross income was not exempt; profits were not "incidental, trifling or non-recurrent"); Rev.Rul. 60-324, 1960-1 Cum.Bull. 173 (An organization which received between 12 and 17% of its total income from banquet sales to the general public and whose facilities were used for outside functions 40% of the *882 time was not exempt); Rev.Rul. 58-589, supra (General public participation must be incidental and in furtherance of general club purposes.); Rev.Proc. 64-36, 1964-2 Cum.Bull. 962, superseded by Rev.Proc. 71-17, 1971-1 Cum.Bull. 683 (effective June 30, 1971) ("The general public may, on occasion, be permitted to participate in a club affair, provided such participation is incidental to and relevant to the club's purpose, and there is no purpose of profit or economic benefit to the members manifested in the character or manner of conduct of the affair.")
Section 501(c)(3) in conjunction with § 501(a) exempts:
Corporations and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific . . . purposes . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual . . .
Under the Regulations, two requirements must be met for an organization to qualify under this subsection. The organization must be both organized and operated exclusively for the purposes listed. Treas.Reg. § 1.501(c)(3)-1(a)(1). See also Commissioner of Internal Revenue v. John Danz Charitable Trust, 284 F.2d 726 (9th Cir. 1960).
In the present case the government argues that it is clear that the Building Association was not organized exclusively for charitable purposes. Plaintiff argues that "charitable" encompasses a broad spectrum of activities; that by scanning the activities engaged in, it is clear that plaintiff operated to serve the public interest; that its business activities were merely in furtherance of its exempt purpose.
To determine for what purposes a corporation is "organized" one must refer to the articles of incorporation, charter, or any written instrument by which the organization is created. Treas.Regs. §§ 1.501(c)(3)-1(b)(1)(i), 1.501(c)(3)-1(b)(2). To be organized "exclusively" for exempt purposes, the articles must not "expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes." Treas.Reg. § 1.501(c)(3)-1(b)(1)(i)(b). A purpose is an "exempt" purpose if specified in § 501(c)(3). Treas.Reg. § 1.501(c)(3)-1(a)(2).
Plaintiff's purposes are set forth in Article II of its Articles of Association. Prior to 1967, when the article was amended, the object of the organization was "of a social nature . . . to promote better relations amongst its members, to provide grounds, buildings and equipment for educational, recreational and physical activities for the members". In 1967 the Articles were amended to delete the first phrase and to add: "to produce, secure and provide funds and facilities to SANTA CRUZ COUNCIL OF KNIGHTS OF COLUMBUS to assist, provide and promote the welfare of Charitable organizations."
The language of neither amendment limits the corporate purposes to one or more exempt purposes. Moreover, there is no limitation requiring that activities not in furtherance of exempt purposes be but an insubstantial part of its activities. For example, providing a building for the recreational use of its members does not embody any charitable purpose as that term is construed in the Regulations. Treas.Reg. § 1.501(c)(3)-1(b)(1)(iii) (Articles that allow organization "to engage in the operation of a social club" do not meet the organizational test); Treas.Reg. § 1.501(c)(3)-1(d) (Defines exempt purposes). The members who benefit are members of the Knights of Columbus. While the Knights of Columbus may engage in charitable endeavors, its members are certainly not limited to those to whom society owes an obligation. Treas. Reg. § 1.501(c)(3)-1(d)(2). (Charitable defined). See also Duffy v. Birmingham, 190 F.2d 738 (8th Cir. 1951) which defines charitable:
The reason underlying the exemption . . . is that the exempted taxpayer performs a public service. The common element of charitable purposes within the *883 meaning of the section is the relief of the public of a burden which otherwise belongs on it. Charitable purposes are those which benefit the community by relieving it pro tanto from an obligation which it owes to the objects of the charity as members of the community.
Nor does the Article indicate any limits on the amount of time or resources to be used for nonexempt purposes. Thus, the Building Association is an organization which is devoted to an unspecified extent to activities benefiting its own members, toward whom society in general has no obligation to support or aid. The Articles of Association are too broad to allow a charitable exemption under the organizational test. For the same reasons, the Association does not qualify for a § 501(c)(3) exemption under the other exempt purposes listed (religious, scientific, testing for public safety, literary, education or prevention of cruelty to children or animals), none of which was pressed on the Court by plaintiff.
The operational test for exemption requires little comment. Under the Regulations, if more than an insubstantial part of activities are directed toward nonexempt purposes, then the operational test is not met. Treas.Reg. § 1.501(c)(3)-1(c)(1). From the discussions of § 501(c)(2), (4) and (7) it is obvious that plaintiff operates both a business with the general public and for the benefit of its individual members, neither of which is insubstantial. For the reasons given in the discussion of § 501(c)(4) it cannot be said that these activities are in furtherance of the Association's exempt purpose. They have become an end on their own. Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924) is not to the contrary. In that case the Supreme Court upheld an exemption although the plaintiff sold wine, chocolate and other articles. The Court further found that there was no selling to the public nor competition with others, nor that financial gain was the end to which these sales were directed. In contrast with Trinidad, plaintiff in the present case rented to the public, in competition with other banquet halls and accumulated sufficient amounts of cash to evidence an intention of financial gain. See also, Scripture Press Foundation v. United States, 285 F.2d 800, 152 Ct.Cl. 463 (1960), cert. denied 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962); Samuel Friedland Foundation v. United States, 144 F.Supp. 74 (D.N.J.1956). Thus, an exemption based on § 501(c)(3) must be denied.
Having concluded that plaintiff is not entitled to an exemption under the provisions asserted, judgment will be for the defendant.
NOTES
[1] Contributions were viewed most favorably to the plaintiff. While the parties stipulated that there were two $20,000.00 gifts to St. Mary's Home, these gifts were listed for the years 1968, 1969 and 1970. Thus, the figures for those years may be unduly favorable to plaintiff.