INTERNEIGHBORHOOD HOUSING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Interneighborhood Housing Corp. v. Commissioner
Docket No. 20885-81X.
United States Tax Court
T.C. Memo 1982-661; 1982 Tax Ct. Memo LEXIS 86; 45 T.C.M. (CCH) 115; T.C.M. (RIA) 82661; November 16, 1982. *86 P, a nonprofit corporation, received fees from the City of New York for managing eight apartment buildings owned by the city as a result of tax foreclosures. Held, P has failed to prove that it is organized and operated exclusively for charitable purposes under sec. 501(c)(3), I.R.C. 1954. Msgr. John C. McCarthy and Thomas J. Kloc (directors), for the petitioner. Kevin C. Reilly, for the respondent. SIMPSON
MEMORANDUM OPINION SIMPSON, Judge: The petitioner, Interneighborhood Housing Corporation (INHC), has instituted this action pursuant to section 7428 of the Internal Revenue Code of 1954[1] for a declaratory judgment that it qualifies as an exempt organization under *88 section 501(c)(3). The sole issue for decision is whether INHC was organized and operated exclusively for one or more exempt purposes within the meaning of section 501(c)(3). Pursuant to Rule 217(b), Tax Court Rules of Practice and Procedure, [2] the parties filed with this Court the administrative record relating to the request for a determination that INHC qualifies as an exempt organization. The case was submitted fully stipulated pursuant to Rule 122. The facts in the administrative record are assumed to be true for purposes of this proceeding. INHC was incorporated on July 28, 1977, as a nonprofit corporation under the laws of the State of New York. Its principal place of business at the time it filed its petition in this case was in Bronx, N.Y. On May 1, 1980, INHC filed an Application for Recognition of Exemption with the Commissioner. On May 7, 1981, the Commissioner issued a final determination letter denying such application. Such letter stated, in part: Our adverse *89 determination was made for the following reason(s): A major part of your activity is the management of eight multiple family dwellings for a fee. Income Tax Regulation section 1.501(c)(3)-[1](a)(1) states "In order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section." The management of buildings for a fee is not an exempt activity within the scope of section 501(c)(3) * * *. Accordingly, your organization does not meet the requirements for exemption under that section of the Code. According to its certificate of incorporation, INHC was organized to: carry out educational, scientific, and business purposes incidental thereto in furtherance of the following purposes: a) To combat the physical deterioration of the Northwest Bronx and adjacent areas of Bronx County, New York, and the Marble Hill section of New York County, New York. b) To develop and cooperate with other not-for-profit corporations, entities, and individuals in the development of comprehensive housing rehabilitation, preservation, development, construction, management, and *90 related programs.
c) To initiate housing rehabilitation, preservation, development, construction, management, and related programs in the capacity of sponsor, co-sponsor, developer, co-developer, and/or mortgagor. d) To develop and provide financial, technical, and other assistance to private and non-profit sponsors of rehabilitation, preservation, development, construction and/or management projects for non-luxury housing to be utilized for rental or sale to persons or familes of limited income. e) To receive, expend, lend, and otherwise use financial and other grants, contributions, subvention devises, gifts, loans, and bequests from private, non-private, and government sources in furtherance of the purposes otherwise set forth herein. f) To provide organizational, technical, and professional aid to tenants' associations, including but not limited to aiding in the process of cooperative conversion through such assistance as loans, sponsorships, and aid in obtaining loans for acquisition and development from private and non-private sources. g) To temporarily acquire title to vacant or residential real property for use in rehabilitation and sale by the Corporation and/or *91 other community entities. h) To assist in the formulation of long-range community goals for housing and other related services. i) To act as Administrator, Receiver, or Managing Agent of real property * * * j) * * * to charge and receive reasonable fees, remuneration, or services as are legally permissible in return for the provision of technical, consultant, planning, management, development, or other services to profit or non-profit bodies, corporations, entities, groups, or individuals, provided that said services consist solely of activities in furtherance of the purposes and objectives of the Corporation and do not conflict with any duty, existing or assumed responsibility of the Corporation. The public or quasi-public objective to be served under Section 201(b) of the Not-for-Profit Corporation Law by each business activity undertaken pursuant to this section is specifically to provide self-generated funds so that the Corporation can lessen its reliance upon non-community financial support, to the greatest extent possible, and develop the capacity of the community being served to assume the burden of combatting its physical deterioration. In furtherance of its corporate *92 purposes, the certificate empowered INHC in part: a) To purchase, receive, take by grant, gift, devise, bequest, or otherwise, have or otherwise acquire, own, hold, improve, employ, use, and otherwise deal in and with real or personal property, or any interest therein, wherever situated. b) To sell, convey, lease, exchange, transfer, or otherwise dispose of, or mortgage or pledge all or any of its property, or any interest therein, wherever situated. c) To purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, employ, sell, lend, leave, exchange, transfer, or otherwise dispose of, mortgage, pledge, use, and otherwise deal in and with bonds or other obligations, shares, or other securities or interests issued by others, whether engaged in similar or different business, governmental or other activities. d) To make contracts, give guarantees, and incur liabilities, borrow money at such rates of interest as the corporation may determine, issue its notes, bonds, and other obligations, and secure any of its obligations by mortgage, or pledge all or any of its property or any interest therein, wherever situated. e) To lend money, invest and reinvest its *93 funds, and take and hold real and personal property as security for the payment of funds so loaned or invested. f) To make capital contributions or subventions to other not-for-profit corporations. g) To accept subventions from other persons or any unit of government. h) To carry on its operations and have offices and exercise its powers in any jurisdiction within or without the United States. k) To make donations, irrespective of corporate benefit, for the public welfare or for community fund, hospital, charitable, educational, scientific, civic, or similar purposes, and in time of war or other national emergency in aid thereof. 1) To be a member, associate, or manager of other not-for-profit activities, or, to the extent permitted in any other jurisdiction, to be an incorporator of other corporations. m) To be merged or consolidated with a business corporation pursuant to the authority and requirements of Section 908 of the Not-for-Profit Corporation Law and any successor thereto. The certificate further provided that the directors were not to be compensated, prohibited private inurement, specifically limited lobbying activities to the amount allowable under *94 section 501(c)(3), and required that all remaining assets would be distributed solely to section 501 (c)(3) organizations in the event of INHC's dissolution. INHC was formed as an outgrowth of the work of the Northwest Bronx Community and Clergy Coalition, Inc. (NBCC). The operations of INHC and NBCC were completely independent. However, the bylaws of INHC required that a majority of its directors be active members of NBCC. The directors of INHC included homeowners, community leaders, pastors, an economist, and a public accountant. In its application for exemption, INHC listed the following receipts: Taxable Year
Taxable Year
Taxable Year
Ended 3/31/78
Ended 3/31/79
Ended 3/31/80
Gifts, grants, and
contributions
received
$10,025
$23,450
$100
Gross receipts
from services
8,235
25,349
INHC received contributions from the Campaign for Human Development and the Episcopal Church Housing Fund. Though none of its contributions came from governmental agencies, INHC intended to seek future support in the form of contributions from governmental units, private foundations, corporations, and members of the general public. By September 1980, *95 INHC's sole source of funding came from fees it received from the Department of Housing Preservation and Development (DHPD) of the City of New York for the management of multiple family dwelling units owned by the city as a result of tax foreclosures. INHC was under contract with DHPD to provide management services for such properties, which, at the time of the application for exemption, included 8 apartment buildings with 198 dwelling units. The services performed by INHC for such fees included rent collection, expenditure disbursement, recordkeeping, maintenance of dwelling units and common areas, as well as moderate rehabilitation. INHC's fee was equal to 11 percent of the gross rents collected from the buildings under management. Such percentage was non-negotiable, was set by DHPD, and was the same percentage that other community management groups received for similar services. INHC kept records of its receipts and disbursements and made monthly accountings to DHPD. On the application for exemption, INHC indicated that such "activities, while specifically performed on behalf of the City of New York, are aimed at stemming further deterioration in the housing stock and thus *96 benefit the entire community by providing a stabilizing influence." For the taxable year ending March 31, 1981, INHC had the following net income: Receipts
$25,449
Expenditures
Repairs to apartment buildings
$4,038
Salaries
7,830
Payroll taxes
302
Phone and postage
2,853
Legal
763
Office
2,524
20,585
Net income
$ 4,864
At the beginning and ending of the 1980 taxable year, the net worth of INHC was: Beginning Date
Ending Date
4/1/79
3/31/80
Assets
Cash
$ 1 $4,179
Accounts receivable
190
$ 1 $4,369
Liabilities
Accounts payable
$ 496 Net worth
$ (495)
$4,369
On May 21, 1980, the Commissioner requested that INHC provide supplemental information on its operation to aid him in determining whether INHC qualified for exemption under section 501(c)(3). In response to such request, INHC informed the Commissioner that its management fees were based on a percentage of the gross rents it actually collected. INHC stated that its operation differed from commercial realty agents in that commercial agents normally received fees based on a percentage of the "collectible rent." While the normal realty agent *97 would receive a fee in the range of 6 to 7 percent of collectible rent, INHC stated that such percentage would be higher in the case of properties similar to those managed by INHC, i.e., those requiring more extensive management and maintenance services. INHC further stated: INHC's operations differ from those of a "for profit" real estate organization in that our operations include (a) working with tenant and community organizations to foster better care by tenants for their buildings and neighborhood, (b) providing by referral to or liaison with government service agencies, non-housing services which are beneficial to tenants, and (c) utilizing local residents as employees of the corporation in an attempt to improve the surrounding economic environment. Additionally, INHC is carrying out management services for the benefit of the entire local community in areas that have been abandoned by private landlords and real estate organizations. All fees received for providing such services are used to provide further services to the community. Thereafter, the Commissioner sent INHC a copy of Rev. Rul. 70-535, 1970-2 C.B. 117, and on July 16, 1980, INHC responded, in *98 part: Our application for exemption was made under section 501(c)(3) because we consider ourselves a charitable and educational organization as defined in paragraph (d)(2) of section 501(c)(3)-1 of the Internal Revenue Code. As indicated in the preamble to our certificate of incorporation, the formation of Interneighborhood Housing was a result of a desire to prevent further decline of the Bronx housing stock. To hope for even mild success in our effort, we quickly recognized that physically maintaining buildings would be but a small part of our means. We recognized the problems and environment of the neighborhoods' inhabitants. By meeting with tenant associations, we educate inhabitants of their role in building and neighborhood maintenance. We also provide these under-privileged individuals with information on government programs that address their problems. It is the broad based effort carried on by our organization that makes our primary purpose "to combat community deterioration." Such effort also provides "relief of the under-privileged," and "instructs the public on subjects useful to the individual and beneficial to the community." We serve the public interest. On *99 July 30, 1980, the Commissioner issued a proposed determination letter that INHC did not qualify for exemption under section 501(c)(3). In such letter, he considered that INHC's purposes included housing rehabilitation, preservation, management, and other related programs, and concluded that its certificate included business purposes violative of the organizational test as defined in section 1.501(c)(3)-1(b), Income Tax Regs. He further took cognizance of the fact that INHC's primary activity consisted of managing eight multiple family dwellings and wrote: Revenue Ruling 70-535 held that an organization formed to manage low and moderate income housing projects for a fee does not qualify for tax exemption. The rationale of the ruling is that the primary activity of the organization was carrying on a business with the general public in a manner similar to organizations that are operated for profit. This is not a charitable activity. The fact that the Inter-Neighborhood Housing Corporation performs these services for New York City does not change the business nature of the activity. The fee received by the Corporation is commensurate with that received by for profit entities making *100 the operations of the Corporation virtually indistinguishable from for profit realty organizations. * * * On September 9, 1980, INHC filed a protest. In such protest, INHC wrote, in part: We do believe a Revenue Ruling exists which addresses INHC's case and sets precedent for a favorable determination. We refer you to Revenue Ruling 70-585, particularly situation 3 [1970-2 C.B. 115]. The area in which we operate has a median income level far below that of the city in which it is located. The housing stock is old and badly deteriorated. Our organizational purpose is combatting the deterioration which afflicts this area. Our methods are primarily maintenance, education and coordination of community residents efforts to achieve safe and adequate housing without relocation. We assist in the rehabilitation of residential buildings. * * * The functions performed by INHC, as outlined in the preceding paragraph, go far beyond those carried on by any for profit realty organization. Receipt of a commensurate fee in dollars for quite dissimilar services is an inappropriate basis on which to state that INHC is virtually indistinguishable from a for *101 profit realty organization. [Emphasis in original.] On May 7, 1981, the Commissioner issued the adverse determination letter on which this action for declaratory judgment is based. Section 501(a) exempts from Federal income tax any organization which meets the requirements set forth in section 501(c), and section 501(c)(3) provides that an organization must satisfy three requirements if it seeks to qualify as an exempt organization under such section. Specifically, the organization must be (1) organized and operated exclusively for exempt purposes; (2) no part of its net earnings may inure to the benefit of any private shareholder or individual; and (3) no substantial part of its activities may be devoted to political or lobbying activities. The first requirement is the only one at issue in this case, and the petitioner bears the burden of proving that it meets such requirement. Rule 217(c)(2)(i); Dumaine Farms v. Commissioner,73 T.C. 650, 663 (1980); Hancock Academy of Savannah, Inc. v. Commissioner,69 T.C. 488, 492 (1977). Section 1.501(c)(3)-1(d)(2), Income Tax Regs., defines the term "charitable" and provides, in part: The term *102 "charitable" is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of "charity" as developed by judicial decisions. Such term includes: * * * organizations designed * * * (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency. * * * The petitioner argues that it qualifies as a charitable organization within such meaning. It argues that it was both organized and operated for charitable purposes and concludes that the Commissioner erred in denying its application for exemption under section 501(c)(3). In opposition, the Commissioner maintains that INHC's charter is too broad and that its activities are commercial in nature. Therefore, he concludes that INHC failed both the organizational and operational tests under section 501(c)(3). In order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and *103 operated exclusively for one or more of the purposes specified in such section, and if an organization fails to meet either the organizational test or the operational test, it is not exempt for purposes of section 501(a). Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs.; Gen. Conf. of the Free Church v. Commissioner,71 T.C. 920, 926 (1979); Levy Family Tribe Foundation v. Commissioner,69 T.C. 615, 618 (1978). Under the organizational test, an organization is organized exclusively for one or more exempt purposes only if its articles of organization limit the purposes of such organization to one or more exempt purposes and do not expressly empower the organization to engage in substantial non-exempt activities. Sec. 1.501(c)(3)-1(b)(1), Income Tax Regs. An organization's purposes, as stated in its articles, may be as broad as or more specific than the purposes stated in section 501(c)(3). Sec. 1.501(c)(3)-1(b)(1)(ii), Income Tax Regs. However, such articles may not empower the carrying on of substantial non-exempt activities even though such organization is, by the terms of its articles, created for a purpose that is no broader than the purposes *104 specified in section 501(c)(3). Sec. 1.501(c)(3)-1(b)(1)(iii). Furthermore, section 1.501(c)(3)-1(b)(1)(iv) provides that: (iv) In no case shall an organization be considered to be organized exclusively for one or more exempt purposes, if, by the terms of its articles, the purposes for which such organization is created are broader than the purposes specified in section 501(c)(3). The fact that the actual operations of such an organization have been exclusively in furtherance of one or more exempt purposes shall not be sufficient to permit the organization to meet the organizational test. Similarly, such an organization witll not meet the organizational test as a result of statements or other evidence that the members thereof intend to operate only in furtherance of one or more exempt purposes. [Emphasis added.] The charter of INHC in part declares that the organization was "To combat the physical deterioration of the Northwest Bronx and adjacent areas of Bronx County, New York, and the Marble Hill section of New York County, New York." Such purpose comes within the meaning of charitable as used in section 501(c)(3) and section 1.501(c)(3)-1(d)(2), Income Tax Regs. *105 However, the charter also empowered INHC to engage in such non-exempt activities as housing development, maintenance, construction, and management, and nothing in the charter provides that such activities can only be carried on in furtherance of the purpose to combat the physical deterioration of the Northwest Bronx and related areas. Thus, by its terms, the charter authorized INHC to engage in non-exempt activities.[3] Moreover, the regulations expressly provide that an organization cannot meet the organizational test by statements or other evidence that the members intended to operate in furtherance of one or more exempt purposes. See sec. 1.501(c)(3)-1(b)(1)(iv), Income Tax Regs.; Sebastian-Lathe Co. v. Johnson,110 F. Supp. 245 (S.D.N.Y. 1952). Under these circumstances, we agree with the Commissioner's determination that the purposes and powers enumerated in INHC's charter were too broad. Accordingly, we hold that the organizational test was not met. *106 Moreover, the petitioner has also failed to satisfy the operational test described in section 1.501(c)(3)-1(c), Income Tax Regs. Such test provides that an organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more exempt purposes. An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.; see Better Business Bureau v. United States,326 U.S. 279, 283 (1945); B.S.W. Group, Inc. v. Commissioner,70 T.C. 352, 356-357 (1978). The regulations and the cases contemplate that a single activity may be carried on for more than one purpose. However, this Court has held that a single substantial non-exempt purpose will disqualify an organization under section 501(c)(3) regardless of the number of truly exempt purposes served. Copyright Clearance Center, Inc. v. Commissioner, 79 T.C.     (Nov. 15, 1982); Federation Pharmacy Services v. Commissioner,72 T.C. 687 (1979), affd. 625 F. 2d 804 (8th Cir. 1980); *107 est of Hawaii v. Commissioner,71 T.C. 1067 (1979), affd. without pub. opinion 647 F. 2d 170 (9th Cir. 1981). If there is no substantial non-exempt purpose, the income from a trade or business may be exempt where the activity is carried out in furtherance of an exempt purpose. See, e.g., Industrial Aid for the Blind v. Commissioner,73 T.C. 96 (1979); Peoples Translation Service v. Commissioner,72 T.C. 42 (1979). Section 1.501(c)(3)-1(e)(1), Income Tax Regs., provides, in part: An organization may meet the requirements of section 501(c)(3) although it operates a trade or business as a substantial part of its activities, if the operation of such trade or business is in furtherance of the organization's exempt purpose or purposes * * * See Plumstead Theatre Society v. Commissioner,74 T.C. 1324 (1980), affd. per curiam 675 F. 2d 244 (9th Cir. 1982); Aid to Artisans, Inc. v. Commissioner,71 T.C. 202, 211 (1978); see Monterey Public Parking Corp. v. United States,481 F. 2d 175 (9th Cir. 1973). In determining whether an organization is exempt, the focus *108 is on the purpose for engaging in the activity, not the nature of such activity. North American Sequential Sweepstakes v. Commissioner,77 T.C. 1087, 1093 (1981); Ohio Teamsters Trust Fund v. Commissioner,77 T.C. 189 (1981). The pertinent inquiry is whether an organization's exempt purpose transcends the profit motive rather than the other way around. Elisian Guild, Inc. v. United States,412 F. 2d 121, 124 (1st Cir. 1969). INHC argues that it comes within the meaning of section 1.501(c)(3)-1(d)(2), Income Tax Regs., as an organization designed to combat community deterioration and that it managed the apartment buildings to carry out such purpose. The Commissioner, on the other hand, argues that INHC's activities were not in furtherance of an exempt purpose but rather were in furtherance of a non-exempt commercial purpose (i.e., realty management). Whether the operational test has been satisfied is a question of fact, and the petitioner bears the burden of showing that the Commissioner's determination was incorrect. est of Hawaii v. Commissioner,71 T.C. at 1079; Christian Stewardship Assistance v. Commissioner,70 T.C. 1037, 1042 (1978); *109 Hancock Academy of Savannah, Inc. v. Commissioner,supra;Rule 217(c)(2)(i). After a detailed review of the administrative record, we conclude that the petitioner has not met such burden. On four different occasions, INHC was given the opportunity to detail its activities, specifically, to show how such activities differed from those of a commercial realty management organization. Yet, on all of such occasions, the petitioner's responses were vague and were wholly insufficient to prove that its activities reflected or furthered an exempt purpose. In its initial application for exemption, INHC stated that its management activities were "aimed at stemming further deterioration in the housing stock and thus benefit the entire community by providing a stabilizing influence." Later, in response to an IRS request for further elaboration on its activities, INHC stated only that it worked with tenant groups to foster better care for their buildings, that it provided a liaison to governmental agencies for beneficial "non-housing services," and that it employed local residents. Still later, the IRS furnished INHC with a copy of Rev. Rul. 70-535, 1970-2 C.B. 117, *110 in which the Service concluded that an organization did not qualify for exemption under section 501(c)(4) where the organization performed managerial, developmental, and consultative services for low and moderate income housing projects, but INHC did little to distinguish its operation from that of the organization described in the revenue ruling. Although INHC stated in a letter that it "recognized that physically maintaining buildings would be but a small part of our means," it merely reiterated the same information it provided in response to the earlier request for information. INHC made no attempt to detail either the activities it performed presently or the activities it expected to perform in the future. After the Commissioner had issued his proposed adverse determination letter, INHC wrote that its situation was apposite to Rev. Rul. 70-585, situation 3, 1970-2 C.B. 115, 116. In that revenue ruling, the Commissioner ruled that nonprofit housing organizations created to aid low or moderate income families by lessening neighborhood tensions, combatting community deterioration, or eliminating prejudice and discrimination may qualify for exemption *111 under section 501(c)(3). In such ruling, an organization was formed to combat community deterioration. Its membership was composed of the residents, businesses, and community organizations in the area, and its main activity was to cooperate with the local redevelopment authority in providing area residents with decent, safe, and sanitary housing without relocating them outside the area. Such organization developed an overall plan for the rehabilitation of the area, sponsored a renewal project where the residents played an active role, and met regularly with the residents. Such organization was supported by Federal funds, membership fees, and contributions. The Commissioner ruled that since the organization's purposes and activities served to combat community deterioration by assisting in the rehabilitation of an old and rundown residential area, it was charitable within the meaning of section 501(c)(3). INHC stated that its methods were "primarily maintenance, education and coordination of community residents efforts to achieve safe and adequate housing without relocation" and that it performed "quite dissimilar services" (emphasis in original) from commercial realty management *112 organizations. Yet, as in its past communications with the IRS, INHC failed to detail the alleged dissimilarity of such services or any of its other claims so as to provide the Commissioner with a basis for distinguishing INHC's operation from a commercial venture or to show that it had carried on activities similar to those described in the revenue ruling. [4] See generally B.S.W. Group, Inc. v. Commissioner,70 T.C. at 356. The petitioner attempted to distinguish its operation from those of a commercial management organization by arguing that its fees were based on a percentage of rents collected while the fees for commercial management organizations were based on a percentage of collectible rent. Even if such difference did exist, it does not appear to be a significant basis for distinguishing the operations of INHC from those of a commercial company. INHC also relied on the fact that it managed buildings which the city had acquired by foreclosure. It may be that private landlords considered *113 such properties to be unattractive investments, but it does not follow that commercial management firms were unwilling to service the properties or were unable to make a profit. INHC also relies on Goldsboro Art League, Inc. v. Commissioner,75 T.C. 337 (1980), for support, but that case is distinguishable. In Goldsboro, the organization operated an art center that furnished educational and charitable services to the community. The organization also sponsored art classes, art demonstrations, and films, owned a variety of art which it displayed in various buildings throughout the county, gave a series of lectures on art, participated in "career day activities" at local schools, and organized a number of museum tours. The organization also operated two public art galleries at which it exhibited and sold art work. This Court held that the art galleries did not further a substantial commercial purpose. In reaching this conclusion, the Court examined the petitioner's activities with respect to such art galleries in connection with its other activities, and stated: The clear impression that we get from the record is one of petitioner's dedication to teach the *114 public, through a variety of means, to appreciate art. We find that petitioner's sales activities are incidental to its other activities and serve the same over-all objective of art education. This is not a case where the other activities are adjunct to petitioner's sales, but, rather, where petitioner's sales activities are secondary and incidental to furthering its exempt purpose. * * * [75 T.C. at 344-345.] Here, INHC's sole activity was housing management, and on this record, it has wholly failed to show that such activity served an exempt purpose or that it engaged in any other activities that served an exempt purpose. In summary, the organizers of INHC are no doubt well meaning individuals, and they may be able to form and operate an organization which will qualify under section 501(c)(3). However, they have been given several opportunities to amplify the administrative record, and we must now decide the case on the record that has been made. On that record, INHC has simply failed to prove that its management activities differed significantly from a commercial real estate management company. See B.S.W. Group, Inc. v. Commissioner,70 T.C. at 358. *115 Accordingly, we sustain the Commissioner's determination that INHC failed to qualify as an organization described in section 501(c)(3). [5]
*116 Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. All references to a Rule are to the Tax Court Rules of Practice and Procedure.↩
3. Commentators have pointed out that the regulations come close to providing a blueprint for the preparation of the basic documents of a charitable corporation, and place upon the lawyer the responsibility of conforming to such blueprints in preparing the basic documents if he desires to obtain a ruling from the IRS that the organization is exempt from tax. See, e.g., Eaton, Sugarman, Mansfield, and Cutler, "How to Draft the Charter or Indenture so as to Qualify for Federal Tax Exemption," 8 Prac. Lawyer 13, 15 (1962); Treusch and Sugarman, Tax-Exempt Charitable Organizations 53 (1979); Hopkins, The Law of Tax-Exempt Organizations sec. 5.1 (3d ed. 1979, Supp. 1980); see generally Santa Cruz Building Ass'n v. United States,411 F. Supp. 871, 882-883↩ (E.D. Mo. 1976).
4. By these comments, we do not mean to imply, and do not express, any views concerning the validity of Rev. Rul. 70-535 or Rev. Rul. 70-585↩.
5. In the administrative record and on brief, the petitioner argues that other organizations similarly situated have been granted exempt status under sec. 501(c)(3). However, we do not have the facts relating to those other cases before us, and we can form no opinion as to whether the other organizations qualify under sec. 501(c)(3). In any event, we must determine whether INHC qualifies under sec. 501(c)(3) by applying the law to the facts in this case. Minchin v. Commissioner,335 F. 2d 30 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; Veterans Foundation v. United States,281 F. 2d 912, 915 (10th Cir. 1960); Davis v. Commissioner,65 T.C. 1014, 1022 (1976). Furthermore, the petitioner is not precluded from amending its charter, filing a new application for exemption, and developing a more complete record at the administrative level. See Houston Lawyer Referral Service v. Commissioner,69 T.C. 570, 577-578 (1978); see also Gen. Conf. of the Free Church v. Commissioner,71 T.C. 920, 932↩ (1979).