# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3012

_____

| | | |
|---|---|---|
| IA 80 Group, Inc. and | * | |
| Subsidiaries, formerly known as | * | |
| Iowa 80 Truckstop, Inc. and | * | |
| Subsidiaries, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Southern District of Iowa. |
| | * | |
| United States of America, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  February 10, 2003

Filed:  October 30, 2003

_____

Before HANSEN,[1] Chief Judge, LOKEN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Iowa 80 Group, Inc. ("Iowa 80") operates multi-building truckstops in Walcott, Iowa, and Joplin, Missouri. The Internal Revenue Service ("IRS") has categorized

---

[1] The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

these facilities as retail convenience stores, which are depreciable over thirty years. Iowa 80 filed an amended tax return that sought a more favorable fifteen-year depreciation. It argued that its truckstops qualified for such depreciation because they are "retail motor fuels outlets"–based on the gross-revenues they generated from petroleum-based products. The IRS, however, rejected Iowa 80's claim. Iowa 80 then filed a refund suit. The district court granted summary judgment in favor of the IRS. On appeal, Iowa 80 argues that the main buildings at these two facilities should be treated as retail motor fuels outlets rather than retail stores. We affirm in part and reverse in part.

I. *Background*

A. *Facilities*

Iowa 80 operates two large truck stops located adjacent to interstate highways in Iowa and Missouri. Its Walcott facility consists of five buildings: a two-story main building, the "Old Headquarters" building, a fuel center, a truck wash, and a service center. Located on the first floor of the main building are three restaurants,[2] a retail store,[3] public telephones, video games, and public restrooms. The first floor also has a small sundries store, which sells a broad range of packaged foods and convenience items. Customers pay for store purchases and gasoline at cashier stations, which are located adjacent to this store.

On the second floor of Walcott's main building there is a television lounge, a one-screen movie theater, over twenty individual shower rooms, additional public

---

[2] These include a traditional sit-down restaurant, a Wendy's, and a Dairy Queen.

[3] This store, known as the "Chrome Shop," sells truck replacement parts such as lights, light bulbs, brake lights, straps to use as load controls, fuses, switches, wiper blades, and other minor replacement parts.

telephones, a coin-operated laundry facility, a dentist's office, a barber shop, a chapel, and office space for Iowa 80's employees.

The Walcott location also has two separate fuel facilities. It has gasoline pumps adjacent to the main building and sixteen diesel pumps behind its Old Headquarters building (which is located behind the main building). The Old Headquarters has no designated walkway from the diesel pumps to the main building. The diesel pumps are primarily served by the fuel center.[4]

Similarly, Iowa 80's Joplin site consists of a main building, a fuel center, a truck wash, a service center, and an above-ground fuel tank. It has five gasoline pumps adjacent to its main building. In Joplin, customers purchase the gasoline at a cashier station inside of the main building. The main building in Joplin also includes a small movie theater, a retail area selling convenience items, a video game room, a restaurant, public showers, public telephones, a laundromat, a television room, and office space for Iowa 80's employees. The fuel center has twelve diesel-fuel pumps as well as a retail space selling snacks, sandwiches, and various driver supplies. It also has public telephones and restrooms. The fuel center is located across the parking lot from the main building in Joplin.

B. *Administrative Claim*

In July 1997, Iowa 80 submitted an "Amended Corporate Income Tax Return" to the IRS claiming a tax refund for the 1995–96 tax year. Iowa 80 claimed a refund on its main buildings at its truckstop facilities, arguing that the buildings could be depreciated on a fifteen-year schedule. Iowa 80 based its claim on the buildings' qualification as retail motor fuels outlets under Internal Revenue Code

---

[4] The fuel center is separate from the main building and contains a Blimpie's restaurant, public telephones and restrooms, and sells small-truck parts as well as snacks and other convenience items.

§168(e)(3)(E)(iii). Section 168(e)(3)(E)(iii) defines what constitutes a retail motor fuels outlet. The taxpayer may establish that its facility is a retail motor fuels outlet either using the gross-revenue test or the floor-space test. *Id.*

In its administrative claim, Iowa 80 attempted to establish that its facilities qualified as retail motor fuels outlets under the gross-revenue test. It argued that its main buildings are not convenience stores and do not compete with typical convenience or grocery stores. It further asserted that the main buildings are the focal point of its fuel marketing business. Finally, Iowa 80 argued that these main buildings derive more than fifty-percent of their gross revenues from petroleum-related products. Accordingly, Iowa 80 argued that it was inappropriate to separate the main buildings' revenues from the revenues generated at other buildings in the truckstop complex. It contended that Congress did not intend for gross revenues to be calculated on a building-by-building basis.

In the memorandum to the IRS, however, Iowa 80 offered no argument concerning the floor space of the properties at issue. It neither argued that it was eligible under the floor-space test nor did it contend that more than fifty-percent of the floor space in these facilities was devoted to petroleum-marketing sales.

The IRS denied Iowa 80's claim for the additional depreciation. In its decision, IRS Agent Steve Kueter observed that the gross-revenues test–if not applied on a building-by-building basis–would be satisfied by Iowa 80. Kueter also noted that Iowa 80 could not "meet the floor-space test based on the amount of the buildings [that it] devoted to activities [that were] unrelated to petroleum marketing such as restaurants, fast food outlets and other activities mentioned above." Kueter further noted that he "believed that [Iowa 80 would] not attempt to show that [the floor-space] test could be met." Iowa 80 appealed Kueter's ruling. The IRS appeals officer then sustained Kueter's denial of the additional depreciation.

## C. *District Court Appeal*

Iowa 80 then appealed the IRS's decision to the district court. In its complaint, Iowa 80 argued that the main buildings in Walcott and Joplin were retail motor fuels outlets under the gross-revenue test. Iowa 80 claimed that the assets in question–when not treated as separate facilities–derived more than fifty-percent of their gross revenues from petroleum and petroleum-related products and thus met the gross-revenue test. Additionally, Iowa 80 argued that the main buildings in Walcott and Joplin qualified as retail motor fuels outlets based on the floor-space test–which requires a building to devote more than fifty-percent of its floor space to the marketing of petroleum or petroleum-based products.[5]

The IRS then moved for summary judgment, which the district court granted. In its order, the court rejected Iowa 80's asset aggregation argument, finding that a retail motor fuels outlet could not encompass several buildings. The court also concluded that the doctrine of variance prevented Iowa 80 from arguing that its buildings qualified as retail motor fuels outlets under the alternate floor-space test.

## II. *Legal Analysis*
### A. *Standard of Review*

We review de novo summary judgments granted by a district court, *Lynn v. Deaconess Medical Center-West Campus*, 160 F.3d 484, 486 (8th Cir. 1998), and construe the record in the light most favorable to the non-moving party. *Casteel v. Continental Casualty Co.*, 273 F.3d 1142, 1143 (8th Cir. 2001). In this taxpayer refund case, the ultimate question for our determination is whether Iowa 80 has overpaid its tax. *Lewis v. Reynolds*, 284 U.S. 281, 284 (1932). Iowa 80 carries the burden of proving "that the United States has money which belongs to him." *Id*.; *see*

---

[5] Iowa 80 also alleged that the main buildings at the Joplin and Walcott facilities qualified as retail motor fuels outlets under the "five-critical factors" test. Because the doctrine of variance bars consideration of this argument, we affirm the district court without further comment.

*also United States v. Pfister*, 205 F.2d 538, 542 (8th Cir. 1953). In order to sustain its burden, Iowa 80 must prove that the initial determination of the IRS was wrong. *Pfister*, 205 at 542.

## B. *Gross-Revenues Test Qualification*

On appeal, Iowa 80 first argues that its Walcott and Joplin main buildings qualify as retail motor fuels outlets under the gross-revenues test. This argument is founded on Iowa 80's contention that gross-revenues–for purposes of the gross-revenue test–are properly calculated by considering the gross revenues attributable to the entire installation, not by dividing the revenues on a building-by-building basis.

### 1. *Asset Aggregation*

Iowa 80's argument relies on an asset aggregation theory. It argues that a retail motor fuels outlet–by definition–is a "commodity market," and that there is no restriction that a "market" be housed in a singular structure. Iowa 80 contends that a retail motor fuels outlet could consist of multiple buildings–used in conjunction with one another. Thus, Iowa 80 argues that §168(e)(3)(E)(iii) does not require that a retail motor fuels outlet's gross revenue be a fraction of the outlet's total revenue–based on the sales generated at each individual structure located on the premises. Instead, it asserts the various structures should be aggregated for revenue purposes.

We decline to adopt Iowa 80's reading of the statute. It does not stand the test of reason. A reading of the statute as Iowa 80 encourages could result in illogical outcomes. For example, restaurants located at a multi-building truckstop could have food sales that exceed the gross revenues of the truckstop's petroleum sales. In such circumstances, none of the outlet's facilities–even those dedicated primarily to petroleum-related sales–would receive the benefit of an accelerated depreciation schedule.

Also, if the entire property was considered a singular retail motor fuels outlet, each building–even those without petroleum-related trade–would receive the favorable tax treatment. Thus, if the retail motor fuels outlet sold a part of its "market" that was not petroleum based, then the non-petroleum business would no longer be entitled to the shelter of the petroleum-based depreciation schedule. This scenario would produce the absurd result of a property that is subjected to a significantly different depreciation life, although neither the property nor the property's enterprise changed in any material way.

Additionally, the legislative history of the statute supports a building-by-building calculation of gross-revenue. The Senate "Committee Report" that accompanied §168(e)(3)(E)(iii) explicitly endorsed the approach that was reflected in a 1995 IRS policy paper.[6] This policy paper specifically addressed the question of whether truckstops or gas stations with multiple buildings on the premises should qualify, noting that "any other building located at the [convenience store] site should be classified according to its use." March 1, 1995 ISP Paper. This statement can only have meaning if the gross-revenue test is applied on a building-by-building basis.[7]

---

[6] Congress modified the means–suggested in the 1995 policy paper–by which a taxpayer may prove that it qualifies as a retail motor fuels outlet. The policy paper advocated a two-pronged test, consisting of a gross-revenue and a floor-space component. The tests outlined in §168(e)(3)(E)(iii) are now disjunctive, as opposed to conjunctive.

[7] Also, there are several references in the statute's legislative history that support the component approach to gross-revenue calculations. The 1995 policy paper describes the convenience store portion of the complex, the "C-store building," as an independent structure. *Id.* Further, in discussing the recommendations contained in the IRS policy paper, the Senate report notes that the proposal limits qualification for the preferred tax treatment to instances where "the *structure* . . . meets a [fifty]-percent test." S. Rep. No. 104-281 at 15, *reprinted at* 1996 U.S.C.C.A.N. 1488 (emphasis added).

Finally, this approach tracks with the IRS's construction of §168(e)(3)(E)(iii). While the IRS has no authority to legislate, it is permitted to construe federal legislation in promulgating its own policies. We accord due weight "to the IRS's interpretation of its statute, and such decisions are not disregarded unless they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable." *Bellas v. CBS, Inc.*, 221 F.3d 517, 530 (3d Cir. 2000) (applying *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) to IRS General Counsel Memorandum statutory interpretations). In a 1997 policy paper dealing with retail motor fuels outlets, the IRS specifically noted that gross revenues should be analyzed on a building-by-building basis. Because the IRS's interpretation of the statute is consistent with the statute's legislative history and is not unreasonable, we accept the IRS's construction of §168(e)(3)(E)(iii).

## 2. *Lessee Argument*

Iowa 80 next argues that all sales generated from businesses that are operated by its lessees should be excluded, and only the revenue from its own enterprises should be considered in assessing the percentage of its gross sales that are petroleum based.

In order to satisfy the gross-revenue test, Iowa 80 must establish that "[fifty-percent] or more of the gross revenues generated from the property are derived from petroleum sales." S. Rep. No. 104-281, *supra*, at 15 (1996), *reprinted at* 1996 U.S.C.C.A.N. 1489. According to the IRS, Iowa 80 is required to "aggregate the gross revenues of all businesses operated in the outlet building whether or not such businesses are operated by the owner." Rev. Rul. 97-29, 1997-2 C.B. 22.

We reject Iowa 80's contention that tenant-generated income should be ignored in a gross-revenue calculation. The use of a building is not transformed because an activity–like operating a restaurant–is conducted by a lessee, as opposed to an owner.

*See* I.R.C. § 168(e)(3)(E). Accordingly, the IRS's ruling correctly considered the aggregate gross revenues of all the businesses operated at the Iowa 80 facilities.

### 3. *Conclusion*

Iowa 80 has failed to establish that the main buildings at its Joplin and Walcott facilities qualify as retail motor fuels outlets. First, Iowa 80 concedes that the Joplin main building does not satisfy the gross-revenue test. Additionally, Iowa 80 admits that in 1996 the amount of gross revenue in the Walcott main building attributable to the sale of petroleum and petroleum-related products was $2,574,609. The amount of gross revenues from tenants was $4,111,542. Of the tenants, only two provide automobile or trucking-related services. The sales from the remaining tenants–three restaurants, a barber, a dentist, and a check-cashing service–totaled $3,832,104. The non-petroleum sales of its lessees alone outweigh the Iowa 80 petroleum-related sales. Thus, for the foregoing reasons, we find that Iowa 80 has failed to prove its main buildings qualify as retail motor fuel outlets under the gross-revenue test.

### C. *Doctrine of Variance*

Iowa 80 argues–in the alternative–that if it fails to meet the gross-revenue test, its main buildings in Walcott and Joplin qualify as retail motor fuels outlets because fifty-percent or more of the floor space in those buildings is devoted to the marketing of petroleum. In response, the IRS argues that we do not have jurisdiction to review such a claim because Iowa 80 did not properly raise this argument in its administrative claim with the IRS. Iowa 80 counters that it sufficiently identified this ground in its administrative claim when it raised the issue of whether the main buildings qualified as retail motor fuels outlets under 26 U.S.C. § 168(e)(3)(E)(iii). In light of the facts of this case and the purposes of the variance doctrine, we hold that Iowa 80 adequately apprised the IRS of its claim of qualification under the floor-space test.

The variance doctrine prevents a taxpayer from appealing a refund denial on a different ground than asserted before the IRS. The doctrine derives from 26 U.S.C. § 7422(a), which prohibits any lawsuit "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the Secretary or his delegate according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof." 26 U.S.C. § 7422(a); *see also Bohn v. United States*, 467 F.2d 1278, 1279 (8th Cir. 1972). Therefore, "[a] ground for refund neither specifically raised by, nor included within the general language of, a timely claim for refund cannot be considered by a court in which a suit for refund is subsequently initiated." *First National Bank of Fayetteville v. United States*, 727 F.2d 741, 744 (8th Cir. 1984).

To avoid the variance doctrine, a taxpayer's administrative claim must be specific. Under United States Treasury regulations, a claim "must set forth in detail each ground upon which a credit or refund is claimed *and facts* sufficient to apprise the Commissioner of the exact basis thereof." 26 C.F.R. § 301.6402-2(b)(1) (emphasis added). "This regulation distinguishes between the ground for the claim–that is, the legal theory upon which the refund is claimed–*and facts* sufficient to apprise the Commissioner of the exact basis thereof." *Lockheed Martin v. United States*, 210 F.3d 1366, 1371 (Fed. Cir. 2000) (citation omitted) (emphasis added).

A claim is sufficiently specific if the basic issue is evident from the record, and the IRS is aware of the nature of the claim. *First National Bank of Fayetteville*, 727 F.2d at 743. However, this is not a stringent standard in light of the reasons for the rule. The variance rule serves to (1) "give adequate notice to the [IRS] of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination"; (2) "provide the [IRS] with an opportunity to correct any errors"; and (3) "limit the scope of any ensuing litigation to those issues which have been examined." *First National Bank of Fayetteville*, 727

-10-

F.2d at 744 (internal quotation marks and citation omitted); *Shanker v. United States*, 571 F.2d 8, 10 (8th Cir. 1978) (citing *United States v. Felt & Tarrant Manufacturing Co.*, 283 U.S. 269, 272 (1931)) ("The filing of a claim allows the IRS to investigate, make an administrative determination of the taxpayer's liability, and possibly avoid court action. The claim 'advise(s) the appropriate officials of the demands or claims intended to be asserted, so as to insure an orderly administration of the revenue.'")

Generally, the government has successfully raised the variance doctrine defense in two contexts. First, the defense has been used to prevent a taxpayer from attempting to raise an issue that was entirely separate and apart from any issue listed in the administrative claim.[8] Second, the defense has been utilized to prevent a taxpayer from litigating a refund claim when its administrative claim was so vague or so general that the IRS could only guess at the precise nature of the taxpayer's claim.[9] Iowa 80's claim does not fall within either of the foregoing categories. Instead, the ground for refund alleged in the district court is substantially the same ground outlined in the claim filed with the IRS.

---

[8] Understandably, a taxpayer is prohibited from raising a new ground for refund at trial when the IRS had no opportunity to investigate the ground administratively. *See, e.g., Real Estate Title Co. v. United States*, 309 U.S. 13 (1940) (taxpayer claimed a deduction for obsolescence at the administrative level and a casualty loss deduction in court); *Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1138 (Fed. Cir. 1983) (taxpayer disputed the appropriate depletion rate with the IRS but added claims for errors in calculating depletion deduction and net operating loss at trial).

[9] A general objection and demand for refund would in fact encompass all conceivable grounds for a refund, but the IRS is not required to ferret out on its own the specific claims advanced by the taxpayer. *See, e.g.*, *Stoller v. United States*, 444 F.2d 1391, 1393 (5th Cir. 1971); *Union Pacific Railroad Company v. United States*, 389 F.2d 437, 445 (Ct. Cl. 1968).

Iowa 80's IRS claim reads, "Changes are due to Change in Depreciation Due to Rev. Proc. 97-10. Total increase in depreciation is $903,598 . . . ." However, this terse statement does not need to stand alone because, "the claim itself is not the only information upon which the Commissioner relies to determine the bases of the claim." *Santa Cruz Building Assoc. v. United States*, 411 F.Supp. 871, 875 (E.D. Mo. 1976); *Davis v. United States*, 21 Cl. Ct 84, 86 (Cl. Ct. 1990) ("In seeking adequate notice, this court may inquire beyond the four corners of plaintiff's tax return. Other written communications to the IRS can also supply adequate notice to support litigation under § 7422.").

Iowa 80's filed claim was supplemented with a memorandum from Iowa 80's Chief Financial Officer. The memorandum in most pertinent part states:

> This memorandum summarizes Iowa 80 Truckstop Inc.'s position regarding why we believe our main truckstop buildings in Walcott, Iowa and Joplin, Missouri, qualify as "retail motor fuels outlets" pursuant to Section 168(e)(3)(E) of the Internal Revenue Code, as amended by the Small Business Job Protection Act of 1996.

This communication alone is sufficient to put the IRS on notice of Iowa 80's ground for seeking refund.[10] *E.g., St. Luke's Hosp. v. United States*, 494 F.Supp 85, 91 n.1

---

[10] The adequacy of Iowa 80's administrative claim is supported by the Court of Claims' useful analysis in *Burlington Northern, Inc. v. United States*, 684 F.2d 866 (Ct. Cl. 1982). The regulations, according to the court, distinguish between the ground of a claim–the legal theory upon which the refund is sought–and facts sufficient to inform the IRS of the exact basis of the claim. In *Burlington Northern*, the issue of law raised by the claim was the deduction under 26 U.S.C. §167 for depreciation based on anticipated obsolescence of the assets; the factual basis of the claim was the asserted finite useful life of the assets. The proof objected to by the IRS, the court reasoned, constituted "a third, lower level of the claim, not addressed or required by the regulation: the supporting facts with which the claimant intends to prove the ultimate fact of anticipated obsolescence." *Id.*

(W.D. Mo. 1980); *Santa Cruz Building Ass'n v. United States*, 411 F.Supp. 871 (E.D. Mo. 1976) (merely stating sections of the Code on which taxpayer relies is sufficient); *Walker v. United States*, 143 F.Supp. 566 (N.D. Tex. 1956) (merely stating that collection of penalty is unconstitutional is sufficient).

Iowa 80's refund claims plainly rest on the ground that its buildings are subject to depreciation based on Rev. Proc. 97-10 and Section 168(e)(3)(E) of the Internal Revenue Code. The IRS understood and considered the merits of Iowa 80's claim of qualification for accelerated depreciation of its asset based on the floor-space test and specifically stated as much in its letter of denial.

## III. *Conclusion*

Thus, because the IRS had sufficient notice that it was subject to a suit on this issue, we hold the doctrine of variance does not apply. For the reasons discussed above, we remand for determination of Iowa 80's ability to qualify as a retail motor fuels outlet under the floor-space test.

_____