# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2662

_____

| | | |
|---|---|---|
| Larry Armstrong; Coleen Armstrong, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| United States of America, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: March 8, 2004

Filed:  May 3, 2004

_____

Before MURPHY, HEANEY, and SMITH, Circuit Judges.

_____

HEANEY, Circuit Judge.

In 1995, the Internal Revenue Service (IRS) issued Larry D. and Coleen Armstrong a Notice of Deficiency for underpayment of taxes in 1989 and 1991. In 1999, the Armstrongs satisfied this debt with a payment of $156,142, the amount that remained due at that time. In 2001, they filed an amended tax return, seeking a refund of $149,871 plus interest for the 1989 calendar year, contending that the IRS's assessment of tax underpayment was erroneous. When the IRS did not respond to

their request for a refund, the Armstrongs began this action in district court.[1]  The district court held that the IRS properly concluded the Armstrongs' actions in 1989 created a taxable situation for which they owed a deficiency, and thus granted summary judgment in favor of the IRS.  The Armstrongs now appeal, and we affirm.

## BACKGROUND

This matter reaches us on appeal from a grant of summary judgment in favor of the IRS;  we thus recite the facts in the light most favorable to the Armstrongs.  Ia. 80 Group, Inc. v. United States, 347 F.3d 1067, 1071 (8th Cir. 2003).  In the fall of 1989, Larry Armstrong sought to arrange a short-term loan to help pay his children's educational costs.  He discussed the matter with Midwest Federal Saving Bank (Midwest Federal), where he had other loans and a longstanding relationship.  Thomas F. Gietzen, who was then assistant vice president at Midwest Federal, informed Armstrong that Midwest Federal could make him the loan, and Armstrong agreed to provide life insurance as collateral.  According to Gietzen, Armstrong was in a hurry due to an out-of-state business trip, so Armstrong signed blank loan documents that they agreed Gietzen would fill in later.  Gietzen agreed to pick up Armstrong's life insurance policies from Armstrong's office in order to fill out the loan documents with the accurate collateral information.

When Gietzen went to Armstrong's office, he was given the wrong documents.  Instead of providing two life insurance contracts, one of Armstrong's employees mistakenly gave Gietzen two retirement plan annuity contracts.  These annuity contracts were issued by UNUM Life Insurance Company of America, and owned by National Marketing Company, Inc. (National Marketing), Armstrong's corporation.  Unaware of any mistake, Gietzen filled in the loan documents listing the annuity

_____

[1]The Honorable Daniel L. Hovland, Chief United States District Judge for the District of North Dakota.

-2-

contracts as collateral. These documents included the promissory note and two collateral receipts, which Armstrong had already signed, as well as forms assigning Armstrong's interest in the annuity contracts to Midwest Federal. The assignment forms were signed by Judy Ballantyne, Secretary-Treasurer of National Marketing, and witnessed by Susan Armstrong, the Armstrongs' daughter. Gietzen forwarded the assignment forms to UNUM, which recorded them and sent a letter, dated November 9, 1989, confirming the assignment to Armstrong's office. On November 15, 1989, Midwest Federal funded the loan for the full amount requested–$134,000.

At this point, the loan agreement appeared fully executed, with Midwest Federal granting a loan to Armstrong which was due November 15, 1990, and Armstrong assigning two annuity contracts as collateral for the loan. The loan agreement, collateral receipts, assignment forms, and confirmation of assignment letter all consistently listed the annuity contracts as collateral for the loan. Shortly after the loan had been funded, Gietzen sent Armstrong a Corporate Authorization Resolution to execute, since the annuity contracts were owned by Armstrong's corporation. At that time, Armstrong realized that the annuity contracts had been listed as collateral, rather than the agreed-upon life insurance policies. He contacted Gietzen, stating that he did not intend to pledge the annuity contracts as collateral, and offered to return the loan proceeds. Armstrong claims that Gietzen then assured him that the assignment would not be valid without a fully executed Corporate Authorization Resolution, that Armstrong could keep the funds from the loan, and that the bank would consider the loan unsecured. None of the loan documents were modified to reflect this conversation, nor was UNUM instructed to void the assignment of the annuity contracts. All of the relevant documents continued to show that the loan was secured by an interest in the annuity contracts.

The next year, the Resolution Trust Corporation (RTC) took over Midwest Federal. When the loan came due on November 15, 1990, Armstrong defaulted. In

a letter dated March 21, 1991, RTC wrote to Armstrong informing him that his loan was more than four months past due and was continuing to accrue interest. When Armstrong had not paid back his loan by June of 1991, RTC withdrew $159,375.53 from Armstrong's annuity contracts, which were still listed as collateral on the loan. In January of 1992, UNUM advised Armstrong and the IRS of the withdrawal from the retirement policies, which the Armstrongs had never reported as taxable income, by way of a Form 1099.

After an examination of the Armstrongs' financial circumstances, the IRS determined that the collateral assignment of the annuity contracts for the 1989 loan made them taxable income. It increased the Armstrongs' 1989 income by $149,871–the 1989 market value of the annuity contracts, and increased their 1991 income by $9,505–the additional value that the contracts had gained by the time of the RTC's withdrawal in 1991. In 1995, the IRS issued the Armstrongs a Notice of Deficiency for taxes due on their additional income for 1989 and 1991. By 1999, the Armstrongs had paid the remainder of the taxes owed for these years, and filed amended returns for 1989 and 1991 seeking refunds of $149,871 and $9,505, respectively.[2] The IRS did not respond to the refund request within six months, so the Armstrongs properly brought this suit in district court seeking refunds for the 1989 and 1991 payments. The IRS moved for summary judgment with respect to the 1991 refund, which the Armstrongs conceded was barred by the applicable statute of limitations.[3] Thereafter, both parties moved for summary judgment as to the 1989 refund. The district court found that the annuity contracts were assigned, perhaps mistakenly, as collateral for Larry Armstrong's loan, making them taxable income. It further held that although the Armstrongs contend that the assignment was not

---

[2]By the time the Armstrongs completed paying for their 1989 and 1991 deficiencies, interest and penalties had accrued at such a rate that their taxes on the additional income actually matched the amount of that income.

[3]The Armstrongs have not pursued their claim for the 1991 refund on appeal.

valid, they did not take adequate steps to modify or rescind the loan. Thus, despite the Armstrongs' protestations of mistake, the district court held that the "realities of the transactions" at issue exhibited that the Armstrongs collaterally assigned annuity contracts in 1989, converting the contracts to taxable income. The district court rendered judgment in favor of the IRS, and this appeal followed.

## ANALYSIS

We review the district court's decision to grant summary judgment de novo. Thom v. United States, 283 F.3d 939, 942 (8th Cir. 2002). Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. As such, we view the facts in the light most favorable to the non-moving party in order to determine whether summary judgment in favor of the movant is warranted. Ia. 80 Group, Inc. v. United States, 347 F.3d 1067, 1071 (8th Cir. 2003). In a taxpayer refund suit, the taxpayer bears the ultimate burden of proving that the taxpayer overpaid his tax. Id.

The IRS based its determination of liability on 26 U.S.C. § 72, which governs the tax treatment of retirement plan annuities such as the ones in this case. According to § 72(p)(1), assignments or pledges of an employee's interest in a plan such as National Marketing's will be treated the same as a taxable distribution from that plan.[4] The Armstrongs concede, as they must, that if there was a valid collateral

---

[4]In pertinent part, § 72(p)(1) reads as follows:

(1) Treatment as distributions.–

    (A) Loans.– If during any taxable year a participant or beneficiary receives (directly or indirectly) any amount as a loan from a qualified employer plan, such amount shall be treated as having been received by such individual as a distribution under such plan.

assignment of Larry Armstrong's annuity contracts for his 1989 loan, § 72(p)(1) would treat the assignment as a taxable distribution from the plan. Citing both North Dakota law and the bylaws of National Marketing, however, the Armstrongs contend that the collateral assignment of the annuity contracts was not valid and therefore should not be taxed. They argue that the assignment was the product of a mutual mistake on behalf of Larry Armstrong and Midwest Federal, that National Marketing's board of directors never authorized the assignment, and as a result the assignment was void and unenforceable.

We are guided by the "established tax principle that a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148 (1974). In this case, the facts establish that Midwest Federal loaned Larry Armstrong $134,000 in 1989, and that Armstrong signed documents assigning his interest in the annuity contracts as collateral for the loan. Armstrong complains that he never intended to do this. By the paper trail, though, the transaction appears to be an unequivocal assignment of the annuity contracts: Armstrong agreed in the loan agreement to collaterally assign the annuity contracts for a $134,000 loan; he signed receipts acknowledging the annuity contracts would be used as collateral; he received the $134,000 in loan proceeds; his office received notice from UNUM that the contracts had been collaterally assigned to Midwest Federal; and lastly, when he defaulted on the loan, the debt was satisfied through the annuity contracts.

There is incongruity between how the Armstrongs ask us to treat the assignment in this tax matter, and how they have treated it for purposes of the

---

(B) Assignments or pledges.– If during any taxable year a participant or beneficiary assigns (or agrees to assign) or pledges (or agrees to pledge) any portion of his interest in a qualified employer plan, such portion shall be treated as having been received by such individual as a loan from such plan.

underlying loan agreement. Larry Armstrong signed documents assigning the annuity polices as collateral for the loan, and has never disavowed those documents through any court proceeding or by modifying the loan contract. When RTC withdrew funds from the annuity contracts to satisfy the defaulted loan, the Armstrongs did not pursue any legal action to assert that the assignment was not valid. In fact, the record is devoid of evidence that the Armstrongs *ever* asked a court to consider the assignment unenforceable until now, in this collateral tax proceeding. They claim that they have consistently argued that the assignment was invalid by way of telephone calls to bank representatives, meetings with congressmen, and other informal methods. Assuming the truth of these assertions, we find it puzzling that the Armstrongs could believe the assignments were invalid for over a decade, yet take no action to reform the contract or seek judicial clarification, see, e.g., Ell v. Ell, 295 N.W.2d 143, 150 (N.D. 1980) (holding judicial reformation of contract is an appropriate remedy when the contract was the product of a mutual mistake); N.D. Cent. Code § 32-04-17 (permitting North Dakota courts to grant specific relief of revising contract that was the product of a mutual mistake), even after funds were withdrawn from the annuity contracts based on those assignments.[5] Given the Armstrongs' own acquiescence to the use of the annuities as collateral, we cannot fault the IRS for treating the assignment of the annuities as a taxable event.

Although we agree with the district court that this case "is a tax refund suit . . . not an action in contract," (Appellants' Add. at 9), we briefly address the Armstrongs' claims that the assignment is void and unenforceable as a contract since

---

[5]The Armstrongs claim that they did not institute any legal action because all parties to the loan agreement believed the annuity assignments were not enforceable, making any further action by them superfluous. While this may have been the case with Midwest Federal, clearly when RTC took over it believed the assignments were valid, since it eventually used the funds from the annuities to satisfy the loan. Thus, the contention that there was simply no use for any legal action since all parties agreed what the loan documents meant is meritless.

tax consequences may flow from that determination. North Dakota Century Code section 32-04-17 permits revision of a contract based on the mutual mistake of the parties "on the application of a party aggrieved." See also Mau v. Schwan, 460 N.W.2d 131, 135 (N.D. 1990). In limited circumstances, the court maintains the ability to rescind a contract based on mutual mistake. N.D. Cent. Code §§ 9-09-02, 32-04-22; Romanyshyn v. Fredericks, 597 N.W.2d 420, 423 (N.D. 1999). It is not, however, *required* to do so. Accord N.D. Cent. Code §§ 32-04-17, -22. A contract based on a mistake of fact is thus voidable, not void, and the aggrieved party is charged with the responsibility of taking action to correct the contract. N.D. Cent. Code § 32-04-17. The Armstrongs have failed to take the steps required to void or modify the contract, and it thus remains in force as originally written despite the alleged mistake.

The Armstrongs next contend that the assignment was void because National Marketing did not formally approve the assignment through its board of directors. North Dakota permits corporations to pledge their assets as security for another person if the transaction is approved by the corporation's board of directors. N.D. Cent. Code § 10-19.1-89(1). We are skeptical of the claim that Larry Armstrong acted without board approval when he signed documents assigning the annuity contracts to Midwest Federal; he was one of National Marketing's three directors. Judy Ballantyne, another director, signed forms assigning the annuity contracts as collateral for the loan. In other words, two of National Marketing's three directors documented their agreement to the assignment of the annuity contracts. Moreover, Larry Armstrong was the president and sole shareholder of National Marketing, and did nothing to disavow the contract which he now ironically claims he had no authority to enter into on behalf of his corporation. Although National Marketing's own bylaws may not have been followed, this does not render the contract void. At most, the circumstances here may present a contract that may have been voidable through appropriate action by an aggrieved party, such as the corporation itself. No such action has been taken.

## CONCLUSION

In this tax case, the Armstrongs ask this court to hold that a 1989 assignment of Larry Armstrong's annuity contracts as collateral for a loan was void and thus not taxable. To do so, we would necessarily turn a blind eye to what the district court termed the "reality of the transactions," since the Armstrongs themselves have not challenged the legality of the assignment through any other proceeding, and, in fact, have enjoyed the benefits of using the assignment as collateral for the loan. We refuse to permit the Armstrongs to collaterally attack a contract when they have neglected to do so directly, and thus affirm the district court.

_____