# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2826

_____

Iowa 80 Group, Inc., and subsidiaries,  \*
formerly known as Iowa 80 Truckstop,  \*
Inc. and Subsidiaries,  \*
 \*
      Appellant,  \* Appeal from the United States
 \* District Court for the
  v.  \* Southern District of Iowa.
 \*
Internal Revenue Service,  \*
 \*
      Appellee.  \*

_____

Submitted: February 14, 2005
Filed: May 4, 2005

_____

Before LOKEN, Chief Judge, RILEY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Iowa 80 Group, Inc., ("Iowa 80") once again appeals the district court's summary judgment order finding that its truckstop facilities failed to qualify as "retail motor fuels outlets," and, thus, were not entitled to a fifteen-year depreciation schedule. In the first appeal, we concluded that Iowa 80's facilities failed to meet the gross-revenues test, but remanded to the district court for consideration of whether the facilities qualified under a floor-space test. *See IA 80 Group, Inc. and Subsidiaries v. United States*, 347 F.3d 1067 (8th Cir. 2003). On remand, the district

court[1] concluded that Iowa 80's facilities failed to meet the floor-space test and granted summary judgment in favor of the government. We affirm.

## I. *Background*[2]

Iowa 80 operates multi-building truckstops in Walcott, Iowa, and Joplin, Missouri. The Internal Revenue Service ("IRS") has categorized these facilities as retail convenience stores, which are generally depreciable over thirty years. However, facilities that meet the requirement of a "retail motor fuels outlet" are entitled to a more favorable fifteen-year depreciation. Iowa 80 filed an amended tax return claiming that it was a "retail motor fuels outlet" and sought the more favorable fifteen-year depreciation. The IRS rejected Iowa 80's claim, and Iowa 80 then filed a refund suit in district court. The district court granted summary judgment in favor of the IRS and Iowa 80 appealed.

In the first appeal, we affirmed the district court's determination that Iowa 80's truckstops failed to meet the gross-revenues test for treatment as a "retail motor fuels outlet." *IA 80 Group, Inc. and Subsidiaries v. United States*, 347 F.3d 1067 (8th Cir. 2003). However, because the district court erred in applying the doctrine of variance, we remanded the case to determine whether the truckstops could meet the floor space test used to confer status as a "retail motor fuels outlet." *Id*. To meet the floor space requirement, Iowa 80 had to show that fifty-percent of the floor space in its buildings were "devoted to petroleum marketing activity." *See* IRS Coordinated Issue Paper on

---

[1]The Honorable Robert W. Pratt., United States District Judge for the Southern District of Iowa.

[2]We set forth a more fact detailed factual recitation in Iowa 80's first appeal. *See IA 80 Group, Inc. and Subsidiaries v. United States*, 347 F.3d 1067 (8th Cir. 2003).

Convenience Stores (March 1, 1995); *see also IA 80 Group*, 347 F.3d at 1071; S. Rep. No. 104-281 (1996), *reprinted at* 1996 U.S.C.C.A.N. 1489.

Iowa 80's experts calculated the total square footage of the Walcott truckstop building at 50,528 square feet. Under the fifty-percent floor space requirement, Iowa 80 needed to show that at least 25,264 square feet of the structure were "devoted to petroleum marketing activity." Iowa 80 submitted the following as areas in the Walcott building as devoted to petroleum marketing:

| | |
|---|---|
| Chrome Shop / Trucker Store: | 10,136 |
| First Floor Restrooms: | 2,354 |
| Video Game Room: | 379 |
| Counters for Gasoline Cashier: | 1,313 |
| Storage Area: | 502 |
| Trucker Store Offices: | 292 |
| Stairs: | 158 |
| Corridor: | 311 |
| Second Floor (showers, TV Lounge, movie theater, phone rooms, and office space): | <u>11,573</u> |
| **Total:** | **27,018** |

At the Joplin truckstop, Iowa 80 calculated the total square footage of the subject building at 18,560 square feet. Thus, Iowa 80 needed to show that 9,280 square feet of the structure were "devoted to petroleum marketing activity." Iowa 80 submitted the following areas in the Joplin building as devoted to petroleum marketing:

| | |
|---|---|
| Trucker Store: | 5,307 |
| Game Room, Showers, TV Lounge: | 3,526 |
| Restrooms: | 570 |
| Phones, corridor: | 966 |
| Entry hallway: | <u>915</u> |
| **Total:** | **11,284** |

Through summary judgment proceedings, the district court interpreted the statutory phrase "devoted to petroleum marketing activity" and excluded the second floor of the Walcott building from space that could be used to meet the fifty-percent rule. Similarly, the district court excluded the game room, showers, and TV lounge in the Joplin building. As such, the district court ruled that Iowa 80 failed to meet the floor-space test and granted summary judgment in favor of the United States.

## II. *Discussion*

Traditionally, we review the grant of summary judgment de novo. *N. Natural Gas Co. v. Iowa Util. Bd.*, 377 F.3d 817, 820 (8th Cir. 2004). Summary judgment is appropriate if the record, viewed in a light most favorable to the non-moving party, contains no questions of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Kincaid v. City of Omaha*, 378 F.3d 799, 803 (8th Cir. 2004); *see also* Fed. R. Civ. P. 56(c). We afford the non-moving party the benefit of all reasonable inferences to be drawn from the record. *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001). The moving party bears the burden of showing both the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. *Kincaid*, 378 F.3d at 803–04 (8th Cir. 2004); *see also* Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *Kincaid*, 378 F.3d at 804 (8th Cir. 2004); *see also* Fed. R. Civ. P. 56(e).

We also review de novo the district court's interpretation of a statute. *Watson v. Ray*, 192 F.3d 1153, 1155–56 (8th Cir. 1999). "Our objective in interpreting a federal statute is to give effect to the intent of Congress." *Id*. (citation omitted). In tax refund cases, our traditional standard of review is extended. "In this taxpayer refund case, the ultimate question for our determination is whether Iowa 80 has overpaid its tax. Iowa 80 carries the burden of proving that the United States has money which belongs to [it]. In order to sustain its burden, Iowa 80 must prove that the initial

-4-

determination of the IRS was wrong." *IA 80 Group*, 347 F.3d at 1071(internal citations and quotation omitted).

By way of background, Iowa 80 bases its claim for accelerated depreciation on 26 U.S.C. § 168(e)(3)(E)(iii). Section 168(e)(3)(E)(iii) allows "any section 1250 property which is a retail motor fuels outlet (whether or not food or other convenience items are sold at the outlet)" to claim a fifteen-year depreciation schedule. Rev. Proc. 87-56, 1987-2 C.B. 674, 686, sets forth the class lives to be used when computing depreciation allowances under § 168. Asset class 57.1, entitled "Distributive Trades and Services--Billboard, Service Station Buildings and Petroleum Marketing Land Improvements," assigns a 15-year recovery period to:

> section 1250 assets, including service station buildings and depreciable land improvements, whether section 1245 property or section 1250 property, *used in the marketing of petroleum and petroleum products*, but not including any of these facilities related to petroleum and natural gas trunk pipelines. Includes car wash buildings and related land improvements. Includes billboards, whether such assets are section 1245 property or section 1250 property. Excludes all other land improvements, buildings and structural components as defined in section 1.48-1(e) of the regulations.

(Emphasis added). A taxpayer may establish that its facility is a retail motor fuels outlet used in the marketing of petroleum and petroleum products using either the gross-revenue test or the floor-space test. *IA 80 Group*, 347 F.3d at 1071; *see also* S. Rep. No. 104-281 (1996), *reprinted at* 1996 U.S.C.C.A.N. 1489. In the previous appeal, we held that Iowa 80's facilities failed the gross revenues test. *IA 80 Group*, 347 F.3d at 1071.

At issue in this case is application of the floor-space test. According to the language of the senate report, a structure falls in Asset Class 57.1 under the floor-space test when "50 percent or more of the floor space in the property is devoted to petroleum marketing sales." S. Rep. 104-281 (1996). Furthermore, Congress directed that the "determination of whether [a taxpayer meets the floor-space test] will be

made pursuant to the recent Coordinated Issue Paper." S. Rep. No. 104-281 (1996), *reprinted at* 1996 U.S.C.C.A.N. 1489. The paper referred to by the senate is the coordinated issue paper released on March 1, 1995.[3] Accordingly, our analysis of the floor-space test must be guided by the 1995 Coordinated Issue Paper ("95 CIP").

The 95 CIP framed the issue as "[w]hether gas station convenience store (C-Store) buildings and truckstop structures are Asset Class 57.1 . . . ." Thus, it is clear that the 95 CIP specifically covers truckstop structures, such as those at issue in this case. However, the 95 CIP neither describes "typical truckstop features," nor does it describe how truckstop floor space is to be calculated. Instead, the 95 CIP describes how C-Store buildings are structured and treated with respect to Asset Class 57.1. With respect to a C-Store, the 95 CIP explains that "facilities such as counters relating to the sale of gasoline dispensed from pump islands, as well as automobile supplies such as oil, anti-freeze, and window-washer fluid" are "devoted to the marketing of petroleum products." Other areas, those not devoted to the marketing of petroleum products, are described by the 95 CIP to include "office area, storage, restrooms, food preparation, walk-in cooler, general sales areas, and, in some cases, seating for customers." The 95 CIP also noted that no services relating to the maintenance of automobiles or trucks are located at the C-Store.

The 95 CIP further explains that "[a]djacent carwash buildings are accepted as Asset Class 57.1 property, as are associated land improvements used for the marketing of petroleum products such as pump islands and canopies." The 95 CIP takes the position that structures "primarily used to sell convenience items and not to

---

[3]Prior to the enactment of 26 U.S.C. § 168(e)(3)(E)(iii), the IRS viewed the gross-revenue test and floor-space test as a conjunctive two-prong test. *See* IRS Coordinated Issue Paper on Convenience Stores (March 1, 1995). On April 2, 1997, the IRS issued a revised Coordinated Issue Paper to formally adopt Congress' sentiments that the test be disjunctive. *See* IRS Coordinated Issue Paper on Convenience Stores (April 2, 1997). However, Congress has never directed that the revised coordinated paper be used to determine whether a building passes the floor-space test.

market petroleum products" are "fully adaptable retail building[s] that compete with other convenience stores and small grocery stores, [and, t]herefore, [are] not includible in Asset Class 57.1"[4] We conclude that the 95 CIP compares the services or goods provided at a structure with other similar markets to determine the status of the structure under Asset Class 57.1. Similarly, the 97 CIP conceives a traditional service station as the guidepost for determining Asset Class 57.1. According to the 95 and 97 papers, features typically associated with traditional service stations include service bays, tire changing and repair facilities, and car lifts.

We recognize that commerce evolves and that a "traditional service station," or in this case a "traditional truckstop," will likely change with competitive marketing practices. However, Congress has demonstrated its ability to change the applicable testing mechanisms as a CIP becomes outdated. Indeed, the 95 CIP explains that the fifty-percent test was developed to "take into consideration the changes that have occurred in the petroleum marketing business over the years." To this extent, Congress and the IRS have recognized that "traditional" will change with time. Congress is better equipped than our court to modify market-based tests in this area. Accordingly, we will confine our review to those concepts stated in the 95 CIP specifically referenced by Congress in enacting 26 U.S.C. § 168(e)(3)(E)(iii).

The district court focused on the term "devoted" to determine whether the designated floor space could be aggregated in favor of Iowa 80. Using a relatively narrow definition, the district court concluded that "the floor space occupied by the movie theater, arcade, restaurant, showers, laundromat, and TV lounge" were not devoted to the marketing of petroleum products. We decline to adopt the single word "devoted" as the touchstone of our analysis to the exclusion of the examples offered

---

[4]This language, and other similar language, was removed in the 97 CIP without comment. Nonetheless, both papers explain that a "C-Store does not possess any of the traditional attributes of a service station and . . . is not a special purpose structure."

by the 95 CIP. However, we also decline to adopt Iowa 80's broad definition that would essentially encompass anything tangentially related to marketing petroleum.

Iowa 80's position is that the services provided at its building are aimed to attract the professional truck drivers to fuel at its facilities. As such, Iowa 80 contends that those services are used to market petroleum. Iowa 80 explains that because between 70% and 80% of its business is dependent on those services, the floor space those services occupy are "devoted" to the marketing of petroleum. The import of Iowa 80's argument would mean that any service provided at its facility that can be said to "attract truckers" is a service devoted to the marketing of petroleum as contemplated by Congress.

The proper inquiry, however, is a comparison of the services offered by Iowa 80 to the services provided at a traditional service station or other similar markets. Thus, if the services are comparable with services provided at a traditional service station, they can be included; whereas, services similar to other markets are excluded. For example, the floor space in Iowa 80's trucker store, which sells truck parts and maintenance items, is similar to floor space used to sell "automobile supplies such as oil, anti-freeze, and window-washer fluid." IRS Coordinated Issue Paper on Convenience Stores (March 1, 1995). Iowa 80 argues that its multipurpose structure (excluded under Asset class 57.1) is comparable to a separate car wash building (allowable under Asset class 57.1) under Asset 57.1 property classifications. However, Iowa 80 has failed to sufficiently explain how inclusion of the carwash, a special use structure, lends support to its argument. Iowa 80 argues that adjacent carwash buildings are "an inducement in the marketing of petroleum products . . . ." This inference may be rational, but it is not dispositive; the argument attempts to replace the test adopted by Congress through the 95 CIP, services provided at a traditional service station, with a test of convenience. We believe this standard goes beyond what Congress intended with the enactment of 26 U.S.C. § 168(e)(3)(E)(iii).

Employing a services-comparison standard, we conclude that the district court properly determined that Iowa 80 failed to meet the fifty-percent floor-space test. The floor space attributed to the movie theater, arcade, showers, laundromat, and TV lounge are not features normally associated with a service station. Such spaces do not approximate the types of facilities identified in the 95 CIP. Iowa 80 attempts to supplement the square footage calculations submitted to the district court by including floor space used in restaurants located at its two facilities. The 95 CIP specifically excludes a "restaurant" from Asset Class 57.1. Once these areas are removed from the aggregate floor-space, it is clear that Iowa 80 cannot meet the floor-space test.[5]

For the reasons discussed above, we affirm the district court's grant of summary judgment.

_____

[5]Iowa 80 contends that certain floor space calculations are disputed creating issues of material fact. The calculation discrepancies are negligible and, even viewed in Iowa 80's favor, would not change the outcome of this case.